UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
Western Division

Jimmy L. Fells

RECEIVED

JUN 2 3 2008

MICHAEL W. DOBBINS
CLERK, U. S. DISTRICT COURT

Plaintiff

vs.                                    CIVIL CASE NO.

Raymond E. McAlpin - Arbitrator FMCS        08 C 50 1 14

                                            Kapala

Defendant

## COMPLAINT

Now Come Plaintiff Jimmy L. Fells Petitioning The Court For A Reopening of The Defendant Arbitrator FMCS Case No. 07-04848. The Discussion And Opinion Of The Defendant Was Very Deeply Bias And Unprofessional Within The Conduct of Hearings. 1404.13. Arbitration Policies And Procedures. The Conduct of The Arbitration proceeding Is Under The Arbitrator's Jurisdiction And Control, And The Arbitrator's Decision (shall) Be Based Upon The Evidence And Testimony presented At The Hearing. The Defendant Violated His Responsibility And Standard To Be Fair And Honest. Plaintiff Presented Over-Whelming Evidences And Testimonies To The Hearing That Was Disregarded By Defendant. If The Defendant Would Have Taking Into Account The Facts of The Case, The Outcome Would Have Been Favorable And Not Bias Toward The Plaintiff.

The Arbitrator WAS BiAs He Stated
In His Discussion And Opinion. Nothing
In The Record of This Cases Can Be
Found To Allow Him To Substitute His
Judgement For The Plaintiff.

Plaitiff Presented Overwhelming Fact,
Testimonies And The Arbitrator Rule WAS
Unprofessional In Conduct.

Within The Same VocAl The Arbitrator
Accuse Both Android Industries And
Chrysler Corporation. In which Both WASn't
Totally Blameless. (see Discussion And Opinion)
                                                    Pg 15.
                                    Exhibit #(1)

Signature

7356 CAsey Dr.
Street Address

Loves Park Il 61111
City        State    Zip

(815) 282-9627
Phone Number

(1) The Company Android Induces Plaintiff's Promise With A Writing Contract That The Company Was Going To Give 50 Hours To Those Employee Who Sign Up To Work That Week. Then Within The Same Vocal Week. Then Within The Same Vocal The Company Renege On There Promise. Accusing Plaintiff Having The Employee Refuse To work. Inwhich The Company Was Negligence For There Action, Not Plaintiff. (See Exhibit # 2 )

2)

Plaintiff WAS Falsely Accuse By His Employer Android Industries of Several Allegation That Are Unfounded Within The Facts And Testimonies.
(See Exhibit # 3)

Plaintiff WAS Also Accuse of Having Employee To Refuse To Work Again Those Allegations Are Unfounded.    (See Exhibit # 4.5)

Plaintiff WAS Accuse of Insubordination And Misconduct Again Those Allegations Are Unfounded And Not True.
(See Exhibit # 6)

(3).

Plaintiff WAS Giving The Option TO
Receive A Twenty Two Days Suspension
And A Last Change Agreement. The U.A.W.
Refuse The Option. Plaintiff Within
Plaintiff Employment Don't Have A
Discipline File, Plaintiff Also Have A
perfect Attendance Never Have Use
points System. If Plaintiff Would Have
Taking The Option Of The Company.
Plaintiff Would Have Been In Violation
Of The Contract. Just Another Good
Reason That The Company Have
Continual To Violate Contract Agreement.
(see Exhibit )
#3

(4)  The Company And Ford Industries Have
Continual To Fight Plaintiff On Ever Front
With Unemployment. The Company Lost All
Of Their Appeals. The Unemployment Ruling
Was That There Wasn't A Violation Of
Plaintiff Being Insubordination And Misconduct.
When Plaintiff Was The U.A.W. Chair-
Person Who Job Is To Uphold The
Union Contract.  (See Exhibit #6)

Plaintiff Have Affidavits From Employee
Who Also Sign Up To Work That Week
For 50 Hours. Plaintiff Not One Time
Told Employee To Refuse To Work.

The Company Presented Testimonies After
Testimonies From Management And Not
One Person Stated That Plaintiff Had
Employee To Refuse To Work.

What Statement Also Came Out In Management Testimonies. The Asst. Plant manager Larry Hiler Stated That management was all Giving Intentionally False Statement Under Oath.        (See Exhibit # 4-5 )
Also Exhibit 7
pg. 30

Now Come Plaintiff Prays That The Court Will Grant A Reopening And Rehearing of The Plaintiff Petition To Proceed After Reviewing All The Fact In Plaintiff Case. Plaintiff Be Reinstated And made whole Based Upon The Facts, Evidence, And Testimonies.

FAST Track response

TO: UAW President Tom little John

# GRIEVANCE

① Exhibit #2

U. W Local ___1268___ (Employer's Name) Android Industries

Grievance No: ___007-73___

Date Filed: ___7-18-07___

Claimant's Name: The UAW LOCAL 1268 - Android

Seniority Date: 1-19-06    Shift:

Department/Workplace: Venezuela Engines Tear Down

Classification: Volunteers Assemblers 50 Hours

Supervisor's Name: Steve Schulte, Larry Hyler, Claudia Cecil

Grievance Handler's Name: The UAW Unit Chair - Jimmy Fells

**Protest and Charge: (Give a narrative description of the problem and include all contract provisions that may apply.)**

The UAW Protest And Charge Android Industries of Belvidere With Violation Of The C.B.A. And Violation of The Android Culture. The Team members Was Promise To Work 50 Hours. 10 Hours A Day For 5 Days. Apparently The Company Renege on The Writing Agreement making The Schedule Mandatory. If A Team member Sign up To work And Then Didn't come That member was Deducted Pay.

**Remedies and Demand:**

The Remedies And Demand: All Team members That volunteered To Work Be Giving The Full 50 Hours That was Promise By A Writing Agreement. Due That This Is Volunteer The SNOD Process Can't Be Used. Ai Hand Book Page 40 of 65 19, Section 19,

Jimmy Fells 7/18/07
(Grievant's Signature & Date)

Leroy Steel 7/18/07
(Union Representative's Signature & Date)

Date & Time Presented to Management 7/18/07

Management's Response:

_____

_____

_____

_____

_____

_____

_____

_____

(Management Representative's Signature & Date)

Union's Response:

[ ]   We accept management's response and/or remedy specified above.

[ ]   We reject management's response and formally appeal this grievance to the next step of the grievance procedure.

_____

(Union Representative's Signature & Date)

Date & Time Presented to Management: _____

*    Protest and Charge: Includes any cited contractual provision/s as well as any other contractual provision/s that may be applicable to this grievance.

**   Remedies and Demands: Includes that the aggrieved party or parties be made whole for all economic and non-economic entitlements and benefits under the current, and/or then existing collective bargaining agreement, including interest dating from the occurrence of the contract violation to the actual payment made to the aggrieved party or parties, calculated at the Internal Revenue Service interest assessment rate. Such make-whole entitlements, include but are not limited to:  wage compensation of any kind, medical and dental benefits, vacation payments, bereavement entitlement, seniority, incentive pay, profit sharing, life insurance, promotions, credited service, and any other contractual benefits the aggrieved party or parties would have received but for the alleged contractual violation by the employer.

# Android Industries- *AI* Belvidere

Belvidere, Illinois 61008

(815) 547-3742 ext. 212

2 Crosslink Parkway

ATE:    July 10, 2007

O:   James Smith, Marcia McIntosh, Traci Huble, Tisheka Barmore, Betty Berkowski, Khaila Bailey, Anita
owell, Justin Gordon, Sherrie Thompson, Maynard Tipton, Michael Reynolds, Anthony Moria, Rickishi
llexander, Randall Douglas, Cipriano Ramos, Rob Shenberger, Chiara Woods, Shelton Zebulun, Chandra
Avington, Brenda Norman, John Randall, Antwon Brown, Michael Stewart, Shawna Garrett, Adriana
Ruiz, Rickishi Mack

FROM:    Claudia Cecil

CC:      Union

SUBJECT:   Shutdown – Changes and New Information

The Company had a sign up sheet for 24 Assembly Operators to volunteer to work 4-ten hour days
(Tuesday – Friday) the week of the shutdown. Those dates are 7/17/07 – 7/20/07.

There has been a change in plans, though. Chrysler has tentatively cancelled the inventory that was
scheduled for Monday, July 16, 2007. We were very concerned that the production work that needed to
be completed that week could be done in 4-ten hours days. So - we have added Monday, July 16th to the
schedule and we will work 10 hours that day too.

Since when you signed up to work during shut down week for 4 days, and we have changed it to 5 days,
we want to give you the opportunity to change your mind and withdraw without any kind of penalty.

Please circle your selection below and return this letter to People Services by 3:00 p.m. Thursday. If
you choose not to work the 5 days, we will go to the next person on the list who volunteered to work
since we had more volunteers than we had openings.

**Yes**     I agree to work Monday (7/16/07) – Friday (7/20/07) from 7:00 a.m. – 5:00 p.m.

**No**      I wish to withdraw my name from the list of volunteers and will not be available to work next
        week.

Date: _____

Name: _____

Print Name: _____

# Android Industries- *Ai* Belvidere

Belvidere, Illinois 61008

(815) 547-3742 ext. 212

:22 Crosslink Parkway

**DATE:**    July 10, 2007

**TO:**    All Ai Team Members

**FROM:**    Claudia Cecil

**CC:**    Union

**SUBJECT:**    Shutdown - Changes and New Information

There are some new changes to our work schedule before and after shutdown. We were notified by Chrysler that these changes are necessary to accommodate model changeover issues and to be certain that the start-up on July 23, 2007 goes smoothly.

- Our inventory scheduled for July 16, 2007 has been *tentatively* cancelled. The first shift Material Handlers were previously notified that all of them had to work on Saturday, July 14th to prepare the plant for inventory. Unless the Chrysler reverse their tentative decision to cancel inventory, it will no longer be necessary for all the Material Handlers to work. There are many Material projects that need to be completed, and Saturday, July 14th will be a good day for that. The projects include rearranging, re-labeling and cleaning up the docks and Shipping & Receiving area. Either Reed or Terri will ask for 6 – 8 volunteers from Materials to work first shift on Saturday, July 14th. In the event that there are not enough volunteers, the six (6) least senior Team Members will be mandated to work.

- Due to the fact that inventory has been *tentatively* cancelled, we will be changing the schedule for the Venezuela build during the week of shut down. We are going to work five (5) 10 hour days instead of four (4). Since there has already been a job posting put up for the four days, we are going to ask the most senior people on the list if they want to work five (5) 10 hour days instead of four(4). If they want to take themselves off the list, we will let them and then move on down to the next person on the list.

- If there is some other change to the schedule due to an inventory issue, we will notify everyone immediately.

- Chrysler has scheduled second shift to run 10 ten (10) hours on July 13th. Therefore, our second shift is also scheduled for ten (10) hours on Friday, July 13th, starting at 3:00 p.m. and running until 1:00 a.m. on July 14th.

- Chrysler's third shift will will resume production at 9:00 p.m. when we return from shut down. This requires us to change the previously announced schedule to start our plant back up again. On Sunday night, July 22, 2007, all third shift Shift Managers and Team Leaders will be required to report to work at 8:00 p.m. All other third shift Team Members will be required to report to work at 9:00 p.m.

# Android Industries- *Ai* Belvidere

1222 Crosslink Parkway

Belvidere, Illinois 61008

(815) 547-3742 ext. 212

**DATE:**    July 12, 2007

**TO:**    All Ai Team Members

**FROM:**    Claudia Cecil

**CC:**    Union

**SUBJECT:**    Shut Down Work Schedule

Thanks to all of you who volunteered to work during next week's shut down.  There were many more volunteers than are required to run the Venezuela engines.

The most senior 26 Assemblers and 6 Material Handlers who volunteered were selected to work in accordance with our labor agreement.  Depending on how production goes and other issues that may arise next week, Team Members may be asked to work on other plant projects during the scheduled working hours.

Additionally, Engineering/Maintenance asked for two helpers next week, and the next two people with the highest seniority were selected from the sign up list.

Team Members who are scheduled to work 7/16/07 – 7/20/07 from 7:00 a.m. to 5:00 p.m. are as follows:

## Material Handlers
| | | |
|---|---|---|
| Kevin Henderson | Bryan Gary | Mike Washington |
| Mike Phillips | Fredrick Day | James Robinson |

## Assembly
| | | |
|---|---|---|
| James Smith | Marcia McIntosh | Traci Huble |
| Tisheka Barmore | Betty Berkowski | Anita Sowell |
| Justin Gordon | Sherrie Thompson | Rickishi Mack |
| Maynard Tipton | Michael Reynolds | Anthony Moria |
| Rickishi Alexander | Randall Douglas | Cipriano Ramos |
| Robbie Shenberger | Chiara Woods | Shelton Zebulun |
| Chandra Avington | John Randall | Antwon Brown |
| Michael Stewart | Shawna Garrett | Ashley McCoy |
| Adriana Ruiz | Latissa Spears | |

## Engineering/Maintenance
| | |
|---|---|
| Lee Farber | Maurice Smith |

# Android Industries- *Ai* Belvidere

1222 Crosslink Parkway                 Belvidere, Illinois 61008                 (815) 547-3742 ext. 212

**DATE:**      July 12, 2007

**TO:**        All Ai Team Members

**FROM:**      Claudia Cecil

**CC:**        Union

**SUBJECT:**   Shut Down Work Schedule

---

Thanks to all of you who volunteered to work during next week's shut down.  There were many more volunteers than are required to run the Venezuela engines.

 The most senior 26 Assemblers and 6 Material Handlers who volunteered were selected to work in accordance with our labor agreement.  Depending  on how production goes and other issues that may arise next week, Team Members may be asked to work on other plant projects during the scheduled working hours.

Additionally, Engineering/Maintenance asked for two helpers next week, and the next two people with the highest seniority were selected from the sign up list.

Team Members who are scheduled to work 7/16/07 – 7/20/07 from 7:00 a.m. to 5:00 p.m. are as follows:

**Material Handlers**

| | | |
|---|---|---|
| Kevin Henderson ✓ | Bryan Gary ✓ | Mike Washington ✓ |
| Mike Phillips (Shane Orr) | Fredrick Day ✓ | ~~James Robinson~~ JohN OwENs ✓ |

**Assembly**

| | | |
|---|---|---|
| James Smith ✓ | • Marcia McIntosh ✓ | Traci Huble ✓ |
| Tisheka Barmore | Betty Berkowski ✓ | Anita Sowell ✓ |
| Justin Gordon ✓ | Sherrie Thompson ✓ | Rickishi Mack ✓ |
| Maynard Tipton ✓ x) Anita c | Michael Reynolds ✓ | Anthony Moria ✓ |
| Rickishi Alexander x | Randall Douglas ✓ | Cipriano Ramos ✓ |
| Robbie Shenberger | Chiara Woods ✓ | Shelton Zebulun ✓ |
| Chandra Avington ✓ | John Randall ✓ | Antwon Brown ✓ |
| Michael Stewart ✓ | Shawna Garrett ✓ | Ashley McCoy ✓ |
| Adriana Ruiz ✓ | Latissa Spears ✓ | TA TEASHA WooDFoRK |
| | | JANiToR |
| | | (Jimmy Fells ) |

**Engineering/Maintenance**

| | |
|---|---|
| Lee Farber ✓ | Maurice Smith ✓ |

John Randall 847-8295

Mayor(s) Tipton 815-877-0815

Betty Berkowski 815 (988-5608) cell
(394-9265) home

Traci Huble 815-509-5883

Anita Sousa 815-877-4033 (cell)
963-8440 (home)

Justin Gordon 815 865-9169

Sandra Arrington 815-394-3770

Shawna Garrett 815 944-2893 cell
963-1227 oabs#

Moria Anthony

Emilie Reynolds (815) 509-6214
969-9251 house
605-4301 cell

Chiara Woods (815) 703-1128

Rickishia Mack (815)509-6214 or(815)394-1304

Antwon Brown (815) 961-8342

Tishelia Berrimore w/s
Roush alexander 544-0011
James Sutton -----204-0625
Belinda(?) -------908-9168
Mitch McIntosh 2009-7037
Loretta Dunbs
1-815-397-6944

John Randall  847-8295

Mayor(s) Tipton  815-877-0879

Betty Berkowski  815 (988-5608)
(389-9266)
Home

Traci Huble  815-509-5883

Anita Sowers  815- 877-4070 (cell)
963-8440 (home)

Justin Gordon  815 865-9169

Chandra Avnglal  815 866-3770

Garrett  815 963/227 bab's #
914-8893 cell

Shawna  969-9251 house
603-4301 cell

Maria Anthony

Mille Reynolds  (815) 509-6214
(815) 703-1128
(815) 509-6214 or (815) 389-1304
T.J. Woods

Vic
Rich
Sam
Belinda
Maria
Cindy
Douglas

(815)
815-
543-3724 (cell)
815-
843-7118
809-7007

# Android Industries- *Ai* Belvidere

1222 Crosslink Parkway                 Belvidere, Illinois 61008                 (815) 547-3742 ext. 212

*Exhibit*
*# 13*

DATE:      July 23, 2007

TO:        George Campa, Tom Littlejohn, Ai-Union Committee

FROM:      Claudia Cecil

CC:        Steve Schultz, Larry Hyler

SUBJECT:   Options Regarding Labor Issues of July 18 – 21, 2007

---

What follows are two options that Ai-Belvidere proposes to address the labor issues that occurred during the week of July 16th.

At this point in the trust the Company has in the Union Committee is non-existent. We have to move forward from this point, mend fences and take care of our business. Option #1 is the option the Company will select and move forward with if the Union and the Company cannot come to agreement on Option #2 by the close of business today, July 23, 2007.

## Option #1

- Will terminate Jimmy Fells for insubordination and misconduct (see attached warning).
- Bryan Gary is to be terminated (see attached warning)
- Marcia McIntosh is to be suspended until August 6, 2007 (see attached warning).
- Terminated/suspended employees will be barred from the premises and treated as trespassers if they come on Ai property; paychecks will be mailed or delivered to the UAW Office in Belvidere
- Employees will be paid only for actual hours worked during week of July 16 – 22, 2007
- Both parties will file grievance, NLRB charges or legal action(s) as they believe to be appropriate

## Option #2

- Will suspend Jimmy Fells until August 18, 2007 for insubordination and misconduct (see attached warning).
- Bryan Gary is to be terminated (see attached warning)
- Marcia McIntosh is to be suspended until August 6, 2007 (see attached warning).
- Terminated/suspended employees will be barred from the premises and treated as trespassers if they come on Ai property; paychecks will be mailed or delivered to the UAW Office in Belvidere
- Employees will be paid only for actual hours worked during week of July 16 – 22, 2007
- The Union agrees to have the terminated and suspended Committee members vacate the property today and immediately. Committee members who are suspended/teminated will not return to the plant for any reason until their suspension is ended; failure to comply with this will result in the individual being treated as a trespasser.
- Jimmy Fells will return to work under a Last Chance Agreement
- Upon Jimmy Fells' return to work, the Union agrees to work closely with him and the plant until all parties agree that he is sufficently capable of working in a leadership capacity and complying with

Android Industries

| Title: | Personnel Meeting Notes - Union | Page 1 of 2 |
|---|---|---|

Team Member  Jimmy Fells                    Shift/Crew    1    Date  7/23/07

**Progressive Discipline:**
☐ Coaching                    ☐ Written Warning
☐ Written Verbal Warning      ☒ Final Warning with 22-Day Suspension        ☐ Termination
                              From  7/23/07  To  8/18/07   Return to work  8/20/07

**Team Member acted outside the <u>Local Agreement (Local)</u> / Memorandum of Understanding or Ai Business System**:    On (Date)              At (Time)

Article # _____    Section # _____    Rule # _____ / Memo # _____

**Description of Issue:**     *How Did He Violated The C.B.A. ?*
Misconduct/violation of CBA and Insubordination
On 7/18/07 <u>led activities</u> which were in violation of the CBA and extended through 7/21/07 (includes but not limited to meeting with employees during work time, instructing employees to refuse work, guaranteeing the payment of 50 hours)
On 7/18/07 after 3 employees (Ramos, Brown, Ruiz) said they wanted to work, <u>pulled them aside</u>, spoke to them angrily and intimidated them into refusing work
On 7/19/07 Plant Manager witnessed Jimmy Fells <u>ordering</u> Betty Berkowski and Traci Huble to sign grievances while he was in the cafeteria
On 7/19/07 was on the Company property without authorization, attempted to hold a meeting, told others who refused work that they did not have to leave
On 7/19/07 refused a direct order from HR Manager and Plant Manager to leave premises; and then refused a direction to wait in the cafeteria while they conferred by phone with Tom Littlejohn     *statement untrue*
On 7/19/07 returned to the plant, told people to instruct their supervisors to punch them in on Time & Attendance because they had been meeting with the Union
On 7/19/07 without consent or authority, called bargaining unit employees into the Union office to me with them – content of the meetings <u>unknown to management</u>   *Guessing!*
On 7/19/07 yelled at a maintenance employee using profanities and threats
On 7/20/07 returned to the plant with the intent to work after refusing work
**Results and/or Impact:**
These actions were a violation of the CBA, interfered with the Company ability to manage its business and have caused (and will continue to cause) harm to employee relations and the Union-Management relationship
Jimmy Fells to return plant key and radio; these will not be returned to him at the end of suspension
Upon return to work after suspension, Jimmy Fells will work normal (line time) first shift hours and will work at a production job full time; he will arrange time to deal with Union issues in accordance with the CBA and will have any and all overtime authorized by either Rick Christenberry or Claudia Cecil
**Team Member Feedback:**


**Solutions to be Successful:**
Work with UAW for training; sign off on all grievances, board charges or legal actions by UAW local management (i.e., Littlejohn, Campa); will return to work on a Last Chance

Released:  22-Nov-02

Android Industries

| Title: | **Personnel Meeting Notes - Union** | **Page 2 of 2** |

Agreement
**Commitments:**
Comply with CBA and Last Chance Agreement

If behavior recurs, Ai will take this to the next level of progressive discipline

Team Member

Leader _____     Date _____

Committee Person _____     Date _____

_____     Date _____

*I hereby waive my right to UAW representation regarding this matter.*
Team Member

_____     Date _____

Personnel Meeting Notes - Union

Released:  22-Nov-02

the CBA.  There will be a weekly meeting and no grievances, board charges,  or any other type of leagal actions are to be filed until reviewed, approved and signed off on by Tom Littlejohn or George Campa during this time.

- Jimmy Fells will work a full time production position and will arrange to be off the line for Union business with his/her supervisor as described in the CBA.  Jimmy Fells will work the normally scheduled hours (line time) for first shift employees.  Work outside of those hours must be approved in advance by either Rick Christenberry or Claudia Cecil.
- Jimmy Fells is to immediately surrender his plant key and radio; these will not be returned to Jimmy Fells or any other member of the Union Committee.
- The Union agrees to withdraw the all grievances pertaining to this matter, agrees to write no new grievances on this matter, and further agrees to take no other legal action including the filing of NLRB charges.
- The Union also agrees to write no new grievances on this matter and further agrees to take no other legal action including the filing of NLRB charges.

These incidents must be put behind us and we must move forward to create a cooperative, mutually respectful and beneficial work environment.

The signature of the parties at the bottom of this 2 page document indicates their agreement to the issues and remedies listed under option #2 within the document.  In the event Option #2 is not agreed to by 2:45 p.m. on July 23, 2007, the Company will proceed with Option #1.


_____          _____
for the Company            DATE/TIME          for the Union            DATE/TIME

Exhibit #4-5

**Grievance Investigation Form**

Grievance #: _____

Grievant: Adriana Ruiz

**What Occured?**

On Monday I was scheduled to work Monday thru Friday for 20 hrs. On Monday that morning my manager Antonio told me that the supervisor Jose Ramon wanted to work 13 people and I was one of them. I didn't understand why because I have more seniority than most of them. I talked to the manager Antonio before about this & the told me she would talk to the holiday. Until Monday.

**When did the event occur?** Date 7/19/2007   Time  12  AM or PM

Adriana Ruiz

**Where did the event occur?**
In the factory

**Why did the event occur?**
Because I was laid off and we all named a contract that we received to work Monday thru Friday.

**Who was involved or is knowledgeable of the event?**
Union management

**Statements of persons involved or knowledgeable of the event**
_____

**Such additional supporting documents**
_____

**Investigation Conducted by:** _____   **Date:** _____

B.H. Were you instructed by any Union offical not to work? No.

B.H. Did the Co ask for people to voluntarily go home? Yes. But when we wanted to have a union meeting they told us to leave the property Rudely.

B.H. Did the Co prevent you from entering the building to perform work? No.

B.H. What did Management say to you when you wanted to work That we couldn't because there was no more engines to tear down.

B.H. Were there any temporary workers allowed to work yes

B.H. when On Saturday

Adriana Ruiz

# Grievance Investigation Form

Grievant: Antwon Brown

Grievance #: _____

## What Occurred?

We signed a contract to work 5 10 hour days for a total of 50 hrs. We worked 3 days and ~~worked~~ the first day we worked 5 hrs the next day it lasted the work 8 hrs 3rd day everybody said No. So they had a option and about to want to said No. So they had temps on Thursday ready to work but the engins were missing. So how could the temps walk with no engins to tear down ready on Wednesday when everybody said we had to work friday. But Saturday after the meeting they said we had to get right off the premises and took out union meeting somewhere else

## When did the event occur? Date _____

Time _____

AM or PM

## Where did the event occur? _____

## When did the event occur? _____

## Who was involved or is knowledgeable of the event? _____

## Which statements of persons involved or knowledgeable of the event? _____

## Which additional supporting documents _____

Investigation Conducted by: _____

Date: _____

B.H. Were you instructed by any Union offical not to work? no

BH. Did the Co ask for people to voluntarily go home? yes

B.H. Did the Co prevent you from entering the building to perform work? yes

BH. What did management say to you when you wanted to work they had temps and we couldn't work

B.H. were there any temporary workers allowed to work ~~YES~~ I don't know

B.H. when ~~thursday~~

Anthwon Brown

Grievance Investigation Form

Exhibit #4.5

Grievant: John Randall

#8(5)
708-5094

Grievance #:

**What Occurred?**

On 7-18-07 we were released early due to motors not being their was asked for 5 volunteers and nobody volunteered to stay. We returned thursday morning 7-19-07 to work and they had called temps to do our work and was were asked to leave the building and the property. We arrived at the union hall at about 7:30 and had a meeting waiting for a response about work from the plant manager and never got one. We all agreed to show up friday 7-20-07 at our agreed time and was not even allowed to enter the building or onto the property. We were told that since we walked out and didn't volunteer to work that we shouldn't be there.

**When did the event occur?** Date 7-18 thru 7-20-07 Time 7   (AM) or PM

**Where did the event occur?**

Anderson Industries

**Why did the event occur?**

We were not going to be given our agreed upon amount of hrs

**Who was involved or is knowledgeable of the event?**

**Which statements of persons involved or knowledgeable of the event**
**Which additional supporting documents**

Investigation Conducted by: Bill Hamilton    Date: 7-25-07

Interview Conducted on 7-25-07 by Bill Hamilton of
John Randall @ 12:55 PM

B.H. Were you instructed by any Union
official not to work?
J.R. NO

BH. Did the Co ask for people to
voluntarily go home?
J.R. They asked for people to voluntarily
stay

B.H. Did the Co prevent you from entering
the building to perform work? J.R. yes on Thursday
and Friday mornings.

BH. What did Management say to you when
you wanted to work

J.R. They told us we didn't Volunteer to
come in to work

B.H. were there any temporary workers allowed
to work?
J.R. yes
B.H. When
J.R. Thursday, Friday and Sat.

John Randall

# Grievance Investigation Form

Grievance #: _____

Grievant: Shane Orr

What Occurred? I was called in Monday + told to come in to work all week. Everybody what none a I keep only off busy enough to work all week.

When did the event occur? Date _____ Time _____ AM or PM

Where did the event occur? _____

Why did the event occur? _____

Who was involved or is knowledgeable of the event? _____

Attach statements of persons involved or knowledgeable of the event

Attach additional supporting documents

Investigation Conducted by: _____    Date: _____

# Grievance Investigation Form

Grievant: Jeremiah Woodfork

Grievance #: _____

**What Occurred?**

Went to work Wednesday and on lunch time then said the engineers will not be in until Friday, they say they wanted three people to stay and they need a thirteen people to come in on Thursday, Bring the Boss of bolt to Bre tell file it was four so Maybe untentered. They made us get off of the property and if was left

**When did the event occur? Date** _____ **Time** _____ **AM or PM**

**Where did the event occur?** _____

**Why did the event occur?** _____

**Who was involved or is knowledgeable of the event?** _____

Such statements of persons involved or knowledgeable of the event
such additional supporting documents

Investigation Conducted by: _____    Date: _____

'LaTeasha' Woodyork

B.H. were you instructed by any Union offical not to work? NO

BH. Did the Co ask for people to voluntarily go home? NO

B.H. Did the Co prevent you from entering the building to perform work? NO

BH. What did Management say to you when you wanted to work They asked for 13 voterteers and I declined

B.H. were there any temporary workers allowed to work. yes.

B.H. when thursday friday & sat.

LaTeasha Woodyork

# Grievance Investigation Form

Grievance: Ashlee McCoy

Grievance #: _____

**What Occurred?**

July 17 Claudie and some ~~store~~ ~~store~~ ~~store~~ Stacy, Tyler stated to us that they all had enough work for eleven people to stay for that day and that for wednesday and thurs erands wasn't going to be in until Friday. Claudie already said the call list and evening said no and other event of the group was to have a meeting in the back of the event and they said we need to go so we went outside and Rick said that we can't stay so the ~~parking~~ ~~lot~~ group and that we had to leave. everyone said we had to work wednesday they said that we couldn't work and they come back to work wednesday then said that we could be called. The group come down said we had too leave or the police would be called. Thursday everyng showed up to the union hall and had a meeting and they said ~~go~~ we were outside and Jimmy called the over and said ~~work~~ and got Jimmy and steve were outside and Jimmy called the over and said

**Where did the event occur?**

**When did the event occur? Date** _____  **Time** _____  **AM or PM**

**Why did the event occur?**

**Who was involved or is knowledgeable of the event?**

such statements of persons involved or knowledgeable of the event

such additional supporting documents

stigation Conducted by: _____  Date: _____

Ashleen.

B.H. were you instructed by any Union
offical not to work? NO

BH. Did the Co ask for people to
voluntarily go home? NO

B.H. Did the Co prevent you from entering
the building to perform work? yes

BH. What did Management say to you when
you wanted to work NO

B.H. were there any temporary workers allowed
to work yes

B.H. when wednesday, Thursday, Friday.

Grievance Investigation Form

Grievant: JUSTIN GORDON

Grievance #: _____

**What Occurred?**

On Wednesday July 18 we were told that two trailers did not arrive (Venusila? engine) and that there is not enough work for all of us. They will need 7 volunteers for that Wed 18 and all volunteers for thurs 19. This was after 11 o'clock. When asked if I were to volunteer I said no for thursday also. Friday was Mandatory for all from 10:00 until the work was done. I was asked to be thursday. I asked we were asked to leave the premises countless times by various people. (Claudia and Rick) I come in on thursday on time and was told to leave the premises. When I came in on friday when was to be 9. Mandatory work day. I was turned away. Yet I saw Mary Tompos working (odd jobs which could have kept us busy) for that Mandatory 10 hrs 5 day week.

**When did the event occur? Date** _____  **Time** _____  **AM or PM**

**Where did the event occur?**

**Why did the event occur?**

**Who was involved or is knowledgeable of the event?**

Who was involved or is knowledgeable of the event

Such statements of persons involved or knowledgeable of the event
such additional supporting documents

Investigation Conducted by: _____  Date: 25/7/7.

B.H. were you instructed by any Union
offical not to work?
No.

B.H. Did the Co ask for people to
voluntarily go home?
Yes

B.H. Did the Co prevent you from entering
the building to perform work?
Yes

B.H. what did Management say to you when
you wanted to work
That they do not need us

B.H. were there any temporary workers allowed
to work Yes.

B.H. when
Thursday and Friday.

Case 3:08-cv-50114 Document 1 Filed 06/23/2008 Page 33 of 118

# Grievance Investigation Form

Grievant: Wanda Arrington

Grievance #: ____________

What Occurred: July 10th after 11:00 lunch break the union reps told us that the company was gonna [illegible] some of us home and keep [illegible] people on day and 13 the next day. That it wouldn't be fair to us. So the union representative [illegible] that it would be fair they had non-union workers doing 5-3 while 28 union workers wait. We all said no we would not work and I was asked to leave the building by management: Steve - plant manager, Claudia - Human Services and [illegible] Christopher [illegible] in a very rude manner, and Marcia and Jimmy was trying to talk to them but they were not trying to hear them. They also threaten us with the police. We came back in the 14th and they had temps working on us.

When did the event occur? Date ____________ Time ____________ AM or PM

Where did the event occur?

Why did the event occur?

Who was involved or is knowledgeable of the event?

Attach statements of persons involved or knowledgeable of the event

Attach additional supporting documents

Investigation Conducted by: ____________ Date: ____________

B.H. were you instructed by any Union offical not to work? no, I was not

BH. Did the Co ask for people to voluntarily go home? Yes, they did

B.H. Did the Co prevent you from entering the building to perform work? Yes, Thursday, friday

BH. What did Management say to you when you wanted to work? they said they had their people they needed.

B.H. were there any temporary workers allowed to work Yes

B.H. when Thursday, friday, Saturday

## Grievance Investigation Form

Grievant: _MIKE CLEMONS_                                    Grievance #: _____

**What Occurred?** we were scheduled to work 10 hour everyday thru friday or on everyday but ran out of parts for things and didn't have no more enges to build, when they us to leave after they shut down to work cause we was surpose to work 60 hours that's what we sign up try So they involed us out- to get so back thursday humb Pe thay had temps to come And take out tobs so they kicked vs out Agman. We came thursday they kicked vs out.

**Where did the event occur?** _____

**Why did the event occur?** _____

**Who was involved or is knowledgeable of the event?** _____

**When did the event occur? Date** _____ **Time** _____ **AM or PM**

Such statements of persons involved or knowledgeable of the event

Such additional supporting documents

Investigation Conducted by: _____  Date: _____

B.H. were you instructed by any Union
offical not to work? no

BH. Did the Co ask for people to
voluntacily go home? yes

B.H. Did the Co prevent you from entering
the building to perform work? yes

BH. What did Management say to you when
you wanted to work that they had temps
In and they sent us home

B.H. were there any temporary workers allowed
to work yes

B.H. when thrusday

# Grievance Investigation Form

Grievant: _Uncle Smile (?)_    Grievance #: _____

**What Occurred?**

We were promise 30 hrs. They lied Bill Stood together as a Union. We All came to work. Thus + they could it work at home on the plant like chesterburg told us we could on Mon. to Wes Union call they brought us to work close on Thurs, Fri, Sat. They did us wrong.

**When did the event occur?** Date _Wednesday 7-18-07_ Time _12:15_ ___ AM or **PM**

**Where did the event occur?**

_At L.P. Were thing had the line set up_

**Why did the event occur?**

_____

**Who was involved or is knowledgeable of the event?**

_____

_____

_____

Please attach statements of persons involved or knowledgeable of the event such as additional supporting documents

Investigation Conducted by: _____    Date: _____

B.H. were you instructed by any Union offical not to work? NO

BH. Did the Co ask for people to voluntarily go home? YES

B.H. Did the Co prevent you from entering the building to perform work? YES

BH. What did Management say to you when you wanted to work, They Call in people to replace US.

B.H. were there any temporary workers allowed to work YES, they work Thurs, Fri, Sat

B.H. when Thurs, Fri, Sat.

Case 3:08-cv-50114    Document 1    Filed 06/23/2008    Page 39 of 118

# Grievance Investigation Form

Grievant: Bickisha Mack

Grievance #: _____

**What Occurred?**

we were told _____ on July 17, 2007 that there was to more work the one to do the complete until thicking at la Wassen that they only comliel to be five people to work for the night they all say we wont together and stuck out we all standed for able to the its half we stoped everyone saying we cont to work. If you dually the people friday to two days the bright that we cll for we called she all to get the money we came to climb no thursday the Ma la fr 2007 asks who turned in and thes through on friday

**When did the event occur?** Date _____ Time _____ AM or PM

**Where did the event occur?** _____

**Why did the event occur?** _____

**Who was involved or is knowledgeable of the event?** _____

List statements of persons involved or knowledgeable of the event

Attach additional supporting documents

Investigation Conducted by: _____    Date: _____

B.H. were you instructed by any Union offical not to work? No

BH. Did the Co ask for people to voluntacily go home? yes

B.H. Did the Co prevent you from entering the building to perform work? yes

BH. What did Management say to you when you wanted to work that we had to leave the building

B.H. were there any temporary workers allowed to work yes temps

B.H. when Thursday July 19, 2007

Rickishu Mack

# Grievance Investigation Form

Grievance #: _____

Grievant: Traci A. Huble

**What Occurred?**

We were asked to sign a paper agreeing to work Monday — Friday from 7am - 5pm + we agreed yes and also not show up Monday attended 2 points would be taken. Monday we worked 10 hrs Tuesday 8 hrs and Wed 5 hrs they them asked us to Volunteer for Thursday 7-3 and Friday 10am to 7 we all said no and the line left on they said that no enough work for the hours they asked us to work. Thurs + Fri the should be at 7am we were told we could not work but they had temps there doing our jobs.

Traci A Huble 7/25/07

**When did the event occur? Date** 7/19/07   **Time** 12:00 p.m  AM or (PM)

**Where did the event occur?**

Android Industries

**Why did the event occur?**

We would not Volunteer to work other hours them what we originally signed up to work

**Who was involved or is knowledgeable of the event?**

myself and app. 19 to 20 coworkers

_____ statements of persons involved or knowledgeable of the event

_____ ich additional supporting documents

_____ stigation Conducted by: _____   Date: _____

Traci Huble

B.H. Were you instructed by any Union offical not to work? NO

BH Did the Co ask for people to voluntacily go home? NO, they asked us to volenteer for different hours than they origanally said.

B.H. Did the Co prevent you from entering the building to perform work? yes

BH. What did Management say to you when you wanted to work we could not work they already had temps

B.H. were there any temporary workers allowed to work yes

BH. when Thurs & Friday

Traci A. Huble

## Grievance Investigation Form

Grievant: Gloria Anthony                                    Grievance #:

**What Occurred?** We Were scheduled to work M-Fri from 7:00 AM to 5:00 PM. On Monday 7.16.07 We Were worked 10 hrs. Tues 7/8 We worked 8 hrs. Wed 7/18 We Worked A half day because the Engines were not here. They asked for 11 volunteers to come back on Thurs. 7/20 And 13 volunteers on Fri 7/21. The Union Reps informed us that since We Were Quarented so her for the week And they weren't Properly Prepared We Were told to leave the premises or the police would be called. They told us to come back Thurs And Friday At 7:00 AM to uphold Our End of the contract. We did so And was Not Allowed in the building And told to leave

**When did the event occur?** Date ___7/19 · 7/20___   Time ___7:00___   (AM) or PM

**Where did the event occur?**  ___Androids Ind.___

**Why did the event occur?** ___Management was not prepared___

**Who was involved or is knowledgeable of the event?** ___Union Reps___

each statements of persons involved or knowledgeable of the event
ich additional supporting documents

stigation Conducted by: ___[signature]___   Date: ___7.35.07___

B.H. were you instructed by any Union
offical not to work? NO

BH. Did the Co ask for people to
voluntarily go home? yes

B.H. Did the Co prevent you from entering
the building to perform work? yES

BH. What did Management say to you when
you wanted to work   we were Asked
to leave the property

B.H. were there any temporary workers allowed
to work    yes

B.H. when    Thurs 7/19    Fri  7.20

# Grievance Investigation Form

Grievant: _Michael Stewart_

Grievance #: _____

**What Occurred?**

On July 17 we worked up to 11:00 mn. When we got back from our lunch break Claudia and Rick gathered everybody together and told us that we were all out of motors and that they were going to leave to let at least half of the group go and were only going to be able to keep the other half to work the following day. After that Claudia went down a list asking who wanted to work and who didn't, everyone of us declined but we all walked outside to have a meeting and Rick and de us all leave. we told us that we couldn't have a meeting or meeting on company grounds.

**Where did the event occur?** _____

**When did the event occur? Date** _07/17/07_   **Time** _4:00_   AM or PM

**Why did the event occur?** _____

**Who was involved or is knowledgeable of the event?** _____

_(signature)_

Attach statements of persons involved or knowledgeable of the event

Attach additional supporting documents

Investigation Conducted by: _____   Date: _____

B.H. were you instructed by any Union offical not to work? No

BH. Did the Co ask for people to voluntarily go home? No

B.H. Did the Co prevent you from entering the building to perform work? yes

BH. What did Management say to you when you wanted to work. They made us all leave.

B.H. were there any temporary workers allowed to work yes

B.H. when 07/13/07 _[signature]_

**Grievance Investigation Form**

Grievant: Betty Berkowski

Grievance #: _____

**What Occurred?**

We the people who had Most priority had the choice To work this shut down week. We who wanted to signed up for 4 10 hour days Tuesday Thru Friday Wednesday a change of Plan took place Claudia brought papers out for us To sign if we wanted to work this week. we had to sign that monday 10 hrs would be a 10 hour work week we worked monday 10hrs and Tuesday we worked 8 hours and wed. We Told us 12 Noon That they had two Trailees Not there yet and we worked better then expected the then need only 11 volunteers to work This Day and then 13 people Friday from 8am until they were Done at That time Claudia ask everyone by name if the chose to Volunteer I arose No because I already had my Life scheduled to work 50 hrs I feel They had us sign the paper so they could Take a point if we didn't show up But what about the 50 hours. at that point I thought this is a union issue.

Signature

**When did the event occur?** Date: 7-18-07    Time: 12:00 Noon    AM or PM

**Where did the event occur?**

Inside ANDROID

**Why did the event occur?**

lack of good planning

**Who as involved or is knowledgeable of the event?**

every one there and that we

ich statements of persons involved or knowledgeable of the event

ich additional supporting documents

B.H. were you instructed by any Union offical not to work? NO we were told we had Breach of Contract and we should be togeather as A union I # Agreed and still Do.

B.H. Did the Co ask for people to <u>we should</u> Voluntarily go home? NO stick togeather as a whole

B.H. Did the Co prevent you from entering the building to perform work? NO

B.H. What did Management say to you when you wanted to work only the Volenteers that <s>th</s> said they would work on wensday

B.H. were there any temporary Workers allowed to work yes Thursday and FRiday

B.H. when

# Grievance Investigation Form

Grievance #: _____

Grievant: _Shumberland_

**What Occurred?**

On 7/8/02 after lunch Claude called everybody together to ask who (Clay's security?) to violate the rest of the day because keep everybody rolling that he would be mobile in the shipment that the crew every body to work he well. She needs volunteers but Thurs (cut-out) work thru at 10:00pm night when ever to that every body plan some together — either a dismission — that if we could it to work I couldn't get into trouble because it was a volunteer discussion.

**When did the event occur?** Date _Wed. 7/8/02_ Time _12:00_ AM or **PM**

**Where did the event occur?**

Motorola Zat.

**Why did the event occur?**

We Engine Shipment didn't arrive on time

**Who was involved or is knowledgeable of the event?**

Steve Schultz, Claudia, Larry, Rick, Steve M - Few other upper level people

ach statements of persons involved or knowledgeable of the event

ach additional supporting documents

stigation Conducted by: _Bill Hamilton_          Date: _7-25-07_

we volunteers would have consisted on 15 people on 15 days out of those 13 people 5 or 6 of them would have been fork lift drivers. The management of AZ didn't tell us to work, they wanted us to volunteer to work by seniority and the rest of us go home. When the majority of us agreed not to work they kick us off the property. Told us to punch out & take our union meeting to the hall, we had to leave the premises at once. Then we come back to work (Contract says "maybe") Jimmy & Chuck was not agreeing upon what our union workers can be. Pluing to use to not agreeing upon what our union workers can be. Pluing to use to not to get out of the bread room, to not sign the papers he/I or she was going to call the union papers and went outside until further notice he/I signed the police. I signed the papers and went outside until further notice

Interview Conducted 7-25-07 @ 12:15 PM
by Bill Hamilton & with Shawna Garrett.

B.H. Were you directed by any Union Offical
  not to work?
S.C. No, it was a group decision. We all
  discussed it together.

B.H. Did the Co prevent you from entering
  the building to perform your work?
C.G. The following day 7-19-07 they would not
  let us work
B.H. What did the Co management say to
  you when you wanted to go to work?
C.G. When I came in I went into the
  break room Claudia told me I couldn't
  clock in and to leave the premisses. Jimmy
  Fells asked me to sign a grievance. Claudia
  told me I couldn't told us to do that at the
  hall and said she would call the police
  if we didn't leave. I punched in on
  Thurs and Friday @ 7:00 AM like I was
  supposed to.



# ATTENTION UAW LOCAL 1268 UNIT 4 MEMBERS

**WE PETITION FOR THE REINSTATEMENT OF JIMMY FELLS, UAW LOCAL 1268 UNIT 4 CHAIRPERSON, WHO WAS WRONGFULLY TERMINATED BY MANAGEMENT, FOR REPRESENTING THE TEAM MEMBERS AND THE COLLECTIVE BARGAINING COMMITTEE.**

# PLEASE SIGN THIS PETITION AND GET JIMMY BACK TO WORK

1. *[signature]* Richards
2. Anita Sowell
3. *[signature]* DiMarco Zambut
4. *[signature]* Bailey
5. *[signature]*
6. Michelle *[signature]*
7. *[signature]*
8. *[signature]*
9. *[signature]* Abbott
10. *[signature]* Stevens
11. *[signature]*
12. Kevin Guthrie

UE# 4



13  JUSTIN  GORDON
14  _Walter Johnson_
15  _Kurt A Camp_
16  Rick Warden
17  _Meeker Winkly_
18  _Steve McBride_
19  _Lorri Wilking_
20  _Pina McBride_
21  _Ander Richards_
22  _Shirley Winkly_
23  _Arthur Hill_
24  _Johnnie Williams_
25  _James Green_
26  _Caroly Henry_
27  _Warren Wright_
28  _Nijhns Watson_
29
30  _Eddie k_
31  _Walter SJ_
32  _Monbon Zimata_
33  _Tina M.L_
34  DeShawda Woods
35  THOMAS TILLMAN



36. _Tommy Gary_
37. _Jerry Joe Smith_
38. _Geoff_
39. _Ron Caviness_
40. _Gauldino Dgarte_
41. _Sherri Fox_
42. _John R Cleaves_
43. _Alfred Morley_
44. _Kay Bryant_
45. _Male Washington_
46. _Stewart Sowell_
47. _Vickel Tourns_
48. _Stanford Etienne_
49. _Remes Etienne_
50. _H_
51. _Calvin Bruce_
52. _Keith Hawk_
53. _Latissa Spearr_
54. _Norman Caisson_
55. _Jr_
56. _James Howard_
57. _Rose M. Holliman_
58. _Charlotte M Jones_

1- MARCIA MCINTISH    Marcia McIntosh

Jonathon A Burns    Jonathon A Burns

Jeannette Woods    Jeannette Woods

Mr Fugu

Maria M DeRoman    Maria M Roman

Sonja Parra    Sonja Parra

Vaniecia Logan    Vaniecia Logan

Brandy Chester    Brandy Chester

Steve Uprick    Steve Uprick

Dyron Hawkins    Dyron Hawkins

Duncan Lewis    Duncan Lewis

Bo Shelton    Bo Shelton

Kandall Douglas    Kandall Douglas

Cheri Hemphill    Cheri Hemphill

LEE Potts    Lee A. Potts

Suzette Boddie    Suzette Boddie

STEVEN SMITH    Steven Smith

SHAQUANDA LEE    Shaquanda Lee

Samual D Pitt

JOSEPH LANDRY SR    Mr Joseph Landry Sr

Anthony McCall    Anthony McCall

**STATE OF ILLINOIS**
**DEPARTMENT OF EMPLOYMENT SECURITY**

*Exhibit # 6*

**BOARD OF REVIEW**

**BOARD DOCKET NO.** ABR-07-10794        **LOCAL OFFICE:** 025

**CLAIMANT:** (RESPONDENT)                **EMPLOYER:** (APPELLANT)

Jimmy L Fells                              Android Industries-Belvidere,LLC
7356 Casey Drive                           C/O UC Express
Loves Park IL 61111                        Po Box 283
                                           Saint Louis MO 63166-0283

**OFFICE USE NO.**    128                  **TYPE OF APPEAL:**

**RDS DOCKET NO.**  AR-7035426A            MC- Misconduct

**REF IDENT. NO.**    538                  **ISSUE AND BENEFIT PERIOD:**

**SOC. SEC. NO.**                          59  07/29/2007 - 08/11/2007

**D E C I S I O N**

This is an appeal by the employer from a Referee's decision dated October 17, 2007. We have reviewed the entire record, including the claimant's application for benefits and the transcript of the Referee's hearing. We find it adequate and the further taking of evidence unnecessary. We also find, after due consideration, that the Referee's decision is supported by the record and the law. We, therefore, incorporate it as part of our decision and affirm that the claimant was not subject to a disqualification of benefits under Section 602A of the Illinois Unemployment Insurance Act. The employer is a party to these proceedings.

The decision of the Referee is AFFIRMED.

q:\pdoxapps\bor\DOCS\07-10794.SFN

ABR-07-10794                                                      Page 2

## BOARD OF REVIEW

_[signature]_
_____
J. HUNT BONAN, Chairman

_[signature]_                          _[signature]_
_____            _____
STANLEY L. DRASSLER, JR.               WILLIAM J. NOLAN
Member                                 Member

_[signature]_
_____
CONSTANTINE M. ZOGRAFOPOULOS
Member

JAN 1 8 2008

Dated and Mailed on _____ at Chicago, Illinois

## NOTICE OF RIGHTS FOR FURTHER REVIEW BY THE COURTS

### (ESTE ES UN AVISO IMPORTANTE RESPECTO A SUS DERECHOS A REPASAR POR LOS CORTES. SI NO LO ENTIENDE, BUSQUE UN INTERPRETE.)

If you are aggrieved by this decision and want to appeal, you must file a complaint for administrative review and have summons issued in circuit court **within 35 days** from the above mailing date.

You may only file your complaint in the circuit court of the county in which you reside or in which your principal place of business is located. If you neither reside nor have a place of business within Illinois, then you must file your complaint in the Circuit Court of Cook County.

Legal references:     o     **Illinois Unemployment Insurance Act, 820 Illinois Compiled Statutes 405/1100**

                      o     **Administrative Review Law, 735 Illinois Compiled Statutes 5/3-101 et seq.**

# STATE OF ILLINOIS
## DEPARTMENT OF EMPLOYMENT SECURITY
## APPEALS DIVISION
## DECISION

**APPEAL DOCKET AR-7035426A**                    **LOCAL OFFICE:** 025

### CLAIMANT:                                    **EMPLOYER:** (APPELLANT)

Jimmy L Fells                                    C/O Uc Express
7356 Casey Dr                                    Android Industries-Belvidere,Llc
Loves Park IL  61111                             Po Box 283
                                                 Saint Louis MO  63166-0283

| | | |
|---|---|---|
| **SOCIAL SECURITY NUMBER:** | | |
| **DATE OF APPEAL:** | August 29,2007 | |
| **DATE OF RECONSIDERATION:** | August 29,2007 | |

**DATE OF HEARING:** October 16 ,2007
**PLACE OF HEARING:** Chicago
**DATE OF MAILING:** October 17, 2007

**APPEARANCES/ISSUES/EMPLOYER STATUS:** The claimant and the employer appeared and testified at the hearing. The claimant was represented by legal counsel. The employer was represented by a service company.   The issue is: Was the claimant discharged for misconduct connected with work as defined in Section 602A of the Illinois Unemployment Insurance Act? The employer is a party to this appeal.

**FINDINGS OF FACT:** The claimant was discharged from his job as an assembler on 7/23/07 because the employer felt he was too aggressive in his union activities.  He was the local UAW chairperson and conducted his union business in a very aggressive manner.  No competent or compelling evidence of any willful violation of a reasonable employer rule was presented.

**CONCLUSION:** Section 602A of "The Unemployment Insurance Act" provides, in part, that an individual shall be ineligible for benefits for the weeks in which he has been discharged for misconduct connected with his work and, thereafter, until he has become reemployed and has had earnings equal to or in excess of his current weekly benefit amount in each of four calendar weeks. The term "misconduct" means the deliberate and willful violation of a reasonable rule or policy of the employing unit, governing the individual's behavior in performance of his work, provided such violation has harmed the employing unit or other employees or has been repeated by the individual despite a warning or other explicit instruction from the employing unit.

The preponderance of the evidence does not indicate any intentional violation of a reasonable employer rule by the claimant. He was discharged for being too aggressive in representing union workers against management. He was discharged for reasons other than misconduct connected with work.

**DECISION:** The determination of the Local Office is AFFIRMED.  No disqualification is imposed under Section 602A of the Act.

DMB                                      DAVID M BLODGETT, Administrative Law Judge    538

**RIGHT OF FURTHER APPEAL:** This decision will become final, unless WRITTEN NOTICE of appeal from the decision is filed within thirty days from the date of mailing shown above. The notice of appeal must be filed at the local unemployment insurance office where the claim is filed, with the Board of Review at 33 S. State, Chicago, Illinois 60603, or by FAX at 312-793-2373.

Q:\PDOXAPPS\DM\DOCS\7035426A.LF1

DEPARTMENT OF EMPLOYMENT SECURITY
3134 11TH STREET
ROCKFORD, IL 61109

DATE: 08-17-2007 SSN:

JIMMY L FELLS
7356 CASEY DR
LOVES PARK, IL 61111

C/O UC EXPRESS

The following determination has been made in connection with your claim for unemployment insurance benefits:

The claimant was discharged from ANDROID IND. because HE RETURNED TO PLANT WITH THE INTENTION TO WORK AFTER REFUSING WORK.

The term misconduct means the deliberate and willful violation of a reasonable rule or policy of the employer if the violation has harmed the employer or other employees or has been repeated by the individual despite a warning or other explicit instruction from the employer. In this case, the claimant's action which resulted in his discharge was not deliberate and willful.

**Therefore, this Determination finds the claimant eligible for benefits, with respect to this issue only, for each week during the period from 07-29-2007 through 08-11-2007 and he will be determined eligible for each week thereafter as long as he meets the eligibility requirements of the Illinois Unemployment Insurance Act.**

Waiting week credit has been granted and/or benefit checks are being ordered for each week of unemployment for which you are eligible. However, the employer who is a party to the determination has thirty (30) days in which to appeal. If the employer appeals, you will be notified of the time and place of the hearing. If you do not receive notification of waiting week credit and/or benefit payment within three weeks from the date of this notice, please notify the office.

SEE THE REVERSE SIDE FOR INFORMATION REGARDING APPEAL RIGHTS

VEASE AL REVERSO PARA UNA TRADUCCION EN ESPANOL DE SUS DERECHOS A APELAR

Ceola LeBlanc – 117
E.S. Service Representative
Phone 815-395-6615 Ext.        Fax 815-395-8669

FORM NBR: Bis-275.1          ISSUE: Section 602A
MIS REF NBR: 03385                                    (C59) DECISION: ALLOW

*Exhibit #7*

27-8155-00-7/JMH/CRH

<div align="center">

**SUMMARY BRIEF**
**IN THE MATTER OF: JIMMY FELLS**
**ARBITRATION FMCS CASE NO.: 07-04848**

</div>

| ISSUE: | Termination | Jimmy Fells (The Grievant) |
|---|---|---|
| EMPLOYER: | Android Industries | (The Company) |
| HEARING DATE: | | |

<div align="center">

**POST HEARING BRIEF OF COMPANY ANDROID INDUSTRIES**

</div>

NOW COMES the Company, Android Industries, by and through its' attorneys Clausen Miller, P.C. and Christopher Henson hereby submitting its' Post Hearing Summary Brief as follows:

**I.    A.    ISSUE/BASIS:**

Did the Grievant violate the terms of the Collective Bargaining Agreement (hereinafter "CBA")?  If so, was the remedy proper?

**B.    ANALYSIS OF ISSUE:**

It is the position of the Company that the Grievant violated one of the most important and vital rights in any Company/Management relationship; the right of the employer to be free from deliberate work interruption by its employees.  This issue goes to the very heart of the CBA, and granting

<div align="center">

1

</div>

1182742

the instant grievance in light of Grievant's behavior would set a troubling

precedent, would directly violate the express terms of the CBA, and very

likely destroy the viability of the long term relationship between the

Company and the Union.  Perhaps most importantly, the adoption of the

Union's position in this matter would immediately endanger the ability of

the Company to assure its sole customer, Chrysler, that it has the ability

complete its requested  work in a timely manner, which would ultimately

be a detriment to both the Company and Union.

### C.    TERMS OF CBA

The importance of avoiding a work interruption is set forth in the CBA, which states:

Article 21, Section 2 - no work Interruptions during this

Agreement's term, (n)either (sic) the Union nor its agent's

will cause, engage in, or authorize its members to engage in

any strike, sympathy strike, work stoppage, picketing,

boycott, sick-out, slowdown or other concerted activity to

interrupt work against AI.  (emphasis added).

The UAW further agreed to the appropriate redress for such violations, as set forth in the

CBA:

Article 21, Section 3 - Discipline

Team members who engage in any activity specified in the

Paragraph above are subject to discipline up to and

2

1182742

including discharge subject to review in Problem

Resolution Procedure.

In addition, Grievant violated Article 7, § 5 of the

CBA, which states:

Section 5 - In-Plant Voting

Ai will allow "in-plant" voting for Union representatives

and Officers of the Local; provided elections are held at

break time and before and directly after any shift.  It is

understood that team members will not leave work stations

to vote during working hours.

Finally, Grievant violated Article 10, Section 1, which provides termination as a remedy

for "just cause."

The record clearly establishes Grievant repeatedly violated the CBA in the week of July

16 - 23, 2007.  Furthermore, he used his authority as Union Unit Chairperson to induce others to

violate the CBA.  Compounding matters on July 19 - 20, 2007, Grievant engaged in gross

insubordination which in and of itself would warrant his immediate termination.

## II.    INTRODUCTION

AI Belvidere operates a an automotive plant in Belvidere, Illinois which manufactures

parts exclusively for Chrysler.  As the sole customer of AI Belvidere, the relationship with

Chrysler is paramount to the existence of the Company.  After opening its doors in 2005, AI

Belvidere employed approximately 500 workers, but due to Chrysler's reorganization and

3

general downsizing in the automotive industry, the Company had to discontinue the third shift. As of the time of the hearing, AI Belvidere employed approximately 350 employees.

The Grievant was unit chairperson for UAW Local #1268 at all relevant times up until the time of his termination from the Company on July 23, 2007.

July 16 - 23, 2007 was a scheduled "down" week for the Company, meaning the Company was not scheduled to work. However, Chrysler requested that the Company "break down" several engines from Venezuela. Although the Company normally does not engage in this activity, the Company agreed to complete the requested work due to its working relationship with Chrysler. It was determined that the best time to perform the operation would be the week it was non-operational, as the Company at the time was running 24 hours per day, and the open week would allow the Company to allocate the time and resources necessary to complete the tasks in a timely manner. Accordingly, the Company created a sign-up sheet for volunteers. Once the requisite number of employees volunteered, the Company informed Chrysler the work would be completed by July 23, 2007.

The week began normally. On Tuesday, July 17, 2007, and through no fault of the Company, the Company became aware of a problem in the delivery of the engines to the Belvidere facility. A Company representative informed Grievant on Tuesday night that the engines were not going to arrive as scheduled, and that alternative plans would have to be made for the work to be completed. The Company was expecting the engines to arrive later in the week, so it was necessary to schedule a sufficient number of employees to complete the task when the required materials did arrive.

4

On Wednesday July 18, Grievant showed up for work with a grievance already in his hand. The Company met with the Union Committee (Grievant, Bryan Gary, Marcia McIntosh and Laticia Spears). Grievant insisted a "contract" had been entered into by virtue of the signature sheet, and that the employees were entitled to 50 hours of pay, regardless of whether work was available.

Grievant stated that he "wasn't going to let them work, that he was going to get their 50 hours of pay for them, and he was just going to get their 50 hours of pay for them, and he was just going to take them out of here." (Joint Exhibit 3.) Significantly, neither the Grievant nor anyone else from the Union disputed the description of Grievant's conversation with management until the time of hearing.

The Union Committee then left the front offices, and proceeded into the plant. Robby Shenberger, a union member, was on the patio eating lunch when Grievant approached him and stated that the employees had been guaranteed 50 hours of work and that the employees should refuse any work offered them by the Company. After lunch and on the plant floor, Grievant assembled the employees, who had already begun work, to discuss the situation. Steve McNease testified he witnessed a hand vote, and there was considerable other evidence presented at the hearing that it was an actual Union meeting, on work time and in a work area. It is undisputed that the work proposal was being discussed, and that Grievant was at the center of a semi-circle of employees in the plant interacting with the other employees.

The Union contends that Steve Schultz and Claudia Cecil followed the Union Committee directly from the meeting into the plant at a distance of 10 - 15 feet. Virtually everyone else, including two Union members, testified that Schultz and Cecil did not arrive on the scene until

5

later. Rick Christenberry specifically testified that Cecil and Schultz did not arrive until after he called Cecil to ask if the Grievant had the right to conduct a union meeting on the Company floor.

When Claudia Cecil and Steve Schultz did arrive, the workers were canvassed to work the remainder of the week. Three of the individual employees verbally stated they wanted to work. The Grievant pulled each of the three individuals (Adrianna Ruiz, Cipriano Ramos and Antwon Brown) aside after accepting work, and after gesturing to them with an angry look on his face, each of the three employees, who had just seconds before volunteered to work, stated they "guessed they couldn't work" and asked that their names be taken off of the work list.[1] Two of the three employees who were convinced to refuse work by Grievant were still employed by the Company at the time of the hearing, yet none were called to testify that these allegations were untrue. Grievant admits to speaking with the group generally, but denied speaking with the three members individually.

The Company told the employees that if they decided to work, they could call Claudia Cecil, head of Human Resources for the Company, later in the day. Sherrie Thompson and Robby Shenberger both called later that day and worked on July 19 - 20, 2007.

The next day Grievant showed up for work along with the union members whom he had told not to work just the previous day. It was subsequently determined that the Local #1287 leadership (Tom Littlejohn and Bill Campbell) told Grievant he should never refuse work, and instructed him to go to work even though he had refused the Company's offer of work. The

---

[1]    Again, this occurrence was documented and presented to Grievant and the UAW on July 19, 2007 (Joint Exhibit 3). Neither the Grievant nor the Union contested the characterizations of the actions or conversation as being incorrect until the hearing.

events that subsequently occurred provided evidence that, by this time, the Grievant was out of

control. He was witnessed telling employees they "had" to sign grievances. The fact that

Grievant had drawn up grievances was not unusual -- he had filed approximately 100 in a year as

unit chairperson -- but he was now ordering employees to do the same without affording them an

opportunity to read the document before writing their signature. Steve Schultz told Grievant to

leave the plant because he had not signed up for work that day. Grievant refused, and tauntingly

asked Schulz if he intended on calling the police to remove him from the premises. Claudia

Cecil then appeared, and reiterated that Grievant had to leave. Grievant stated he was

conducting "union business." Cecil stated that he was free to conduct a union meeting, just not

on Company property.

    Grievant then instigated an argument with Ms. Cecil[2]. After she told him to leave,

Grievant responded by telling her that she would be the one to leave. He threatened her by

stating she would be terminated. Steve Schultz returned, and Grievant was given a direct order

to leave. Grievant again refused.

    The Company called Tom Littlejohn (President of Local #1268) because Grievant was

acting irrational. In the conversation, Tom Littlejohn admitted to the Company over the

telephone that the matter was handled incorrectly by the Grievant, that the members should not

have refused work, and that there was a procedure for dealing with such issues (i.e. filing a

grievance after working the hours offered). Tom Littlejohn then spoke with Grievant, and the

Grievant and the Union Committee left the plant. Grievant would subsequently return to the

plant that day, against the explicit orders of the Company.

---

[2]      For his part, Grievant denied instigating the argument and the subsequent characterization of the argument. The argument was between Grievant, Schultz and Cecil. Makhalia Reitz witnessed the argument as well.

The next day Grievant again showed up at the premises, against the direct order of the Company. Grievant presented a multitude of grievances for signature. After promising that he would provide the Company with the signed grievances, he left the facility without leaving any copies.

On July 23, 2007, Grievant, Bryan Gary and Marcia McIntosh were presented with two options. Gary, who was terminated, also filed a grievance concerning his termination which went to arbitration. In a 15 page decision, the Arbitrator denied Gary's grievance, holding his termination was proper. The Grievant in the instant matter was also terminated. The administrative remedies were exhausted, and the matter of Grievant's termination is now properly before the Arbitrator.

## III.    VIOLATION OF ARTICLE 21 § 2

Article 21, Section 2 of the CBA prohibits an employee from causing, engage or authorize its members to refuse work. At the hearing, Grievant essentially argued that he did not tell the union members to refuse work and therefore did not violate the CBA.

Grievant's argument is simply untenable.

It is undisputed that there was a meeting between the Union Committee and the Company on the morning of July 18, 2007. It is also undisputed that the meeting quickly grew confrontational. Grievant testified under oath that a grievance was not presented at the meeting. This was demonstrably untrue. The grievance was signed (as notification of receipt) by Claudia Cecil at 10:15 that morning.

8

1182742

Schultz, Cecil and Larry Hyler all testified as to what Grievant stated during this exchange. In addition, the meeting was memorialized in writing and submitted as evidence at the hearing. Specifically, Grievant stated:

- that the CBA did not apply for the week because it had been initially a scheduled "down week";

- that the sign up sheet constituted a contract which legally obligated the Company to pay the employees 50 hours of pay even if there was no work available;

- that he shouldn't have to listen to a "BS" meeting and he would tell the other employees to leave, and after being informed this would be illegal under the CBA, stating that it was legal because the Company was refusing to let people work.

## A.    THE CBA APPLIED AT ALL TIMES

Tom Littlejohn, during cross-examination, affirmatively testified that the CBA is always in effect. Bob Wagner, a former operations manager who has been dealing with CBA negotiations and interpretation for approximately 25 years, also testified that the CBA remained in effect at all times. The only individual who took issue with this was the Grievant, and he admitted that the basis of this conclusion was merely his own opinion.

There is no provision in the CBA for situations in which the CBA is not in full force and effect. In fact, the CBA explicitly states that it is to remain in effect for the duration of the agreement. See Article 23, CBA, generally. The sole basis of Grievants novel theory that the CBA did not apply was that the plant was scheduled for a shut down July 16 - 23, 2007.

9

However, it is undisputed that Chrysler specifically requested work which was actually performed by the Company that week. As such, it is also undisputed that the CBA was in full force and effect for the week of July 16 - 23, 2007.

## B.    THE SIGN UP SHEET DID NOT CONSTITUTE A CONTRACT

Grievant asserts that the sign up sheet created a binding contract guaranteeing the employees 50 hours of pay regardless of work availability (Union Exhibit 4). This interpretation is flawed; nowhere in the document does the Company guarantee anything. For whatever reason, the necessary parts for work did not arrive at the Plant as expected. The mistake was both unexpected and not the fault of the Company.

Several individuals (both from the Union and the Company) testified that in situations where there was no work available, there was no expectation of pay, even if the worker had a legitimate expectation of working a full shift. Indeed, there was testimony that this occurred on a semi-regular basis at the Company's Belvidere facility. Unexpected downtime negatively effects both the Company and the employees, but it is an inherent part of doing business in the automotive industry. The Company is not aware of any custom or practice in which a Company pays it's employees not to work due to an unexpected shutdown. Clearly, there is no such provision in the CBA, and this grievance must be viewed in this framework, not upon Grievant's unsupported opinion as to how it should be applied.

Grievant provided no factual or legal basis for the no-work/no-pay commonly established practice not be applied. General and accepted industry custom and practice clearly provide evidence of this fact; it is not unique to AI Belvidere. Accordingly, there was never a contract between the Company and the Union guaranteeing 50 hours of work July 23, 2007.

## C.    INDUCING OTHER EMPLOYEES NOT TO WORK IS A DIRECT VIOLATION OF THE CBA

Grievant told the Company at the July 18, 2007 morning meeting with the Company that he would direct other employees not to work. When he was told this would violate the CBA, he responded by saying it would not be improper because the Company was not offering work.

Unfortunately for Grievant, his own testimony refutes this argument. Grievant admitted that the Company offered work at the meeting, and again after the meeting when Claudia Cecil canvassed the employees for work. No evidence was offered to the contrary. The Company had arranged for work to be done the remainder of the week, and this offer was conveyed to the employees. Unfortunately, Grievant took it upon himself to interfere with the employees who affirmatively stated they wanted to work. Grievants argument that a refusal to work would be proper because the Company was not offering work is insupportable and should be rejected by the Arbitrator. Furthermore, the fact that the work was voluntary does not negate the fact that the work was necessary to complete Chrysler's order. The only thing that changed was the timing of the work; due to an unforeseen change in circumstances, the parts did not arrive when expected. The Company had no control over the delivery of the engines, and in fact spent several hours determining where the shipment was and when it would arrive at the Company facility. Upon ascertaining the whereabouts of the engines, the Company immediately offered Grievant additional work that corresponded to the new schedule of arrival of parts.

## D.    THE GRIEVANT HELD AN ILLEGAL MEETING

After the meeting ended, Grievant went to the employees to inform them of the situation. The Grievant suggested at the hearing (along with McIntosh and Gary) that this meeting occurred on the lunch break. However, a cursory examination of the facts show this could not be

1182742

the case. Robby Shenberger, a union employee, testified he was on the outside patio when Grievant approached the group to tell them about the Company's work proposal, and his instruction to refuse same. Mr. Shenberger then returned to work before being called over for the meeting. Mr. Shenberger unequivocally testified that the meeting took place during work time, on the work floor.

Sherrie Thompson had actually returned to work and was working when she became aware of the meeting.

Steve McNease, Rick Christenberry, Claudia Cecil, Larry Hyler and Steve Schultz all characterized the convergence of employees around Grievant as a union meeting. Steve McNease testified that he witnessed an actual hand vote. Having been a union member for years and having participated in prior meetings, he instantly recognized it as such. He also recalled Grievant discussing the 50 hours of guaranteed work. Rick Christenberry testified it appeared to be a union meeting, with the Grievant at the center of the group and the group in a semi-circle surrounding him discussing the need of the Union to stick together. Mr. Schultz, Ms. Cecil, Mr. Hyler, Mr. Shenberger and Ms. Thompson corroborated the above facts through their testimony at the hearing. The evidence shows that Grievant violated Article 7, §5.

The Grievant's position is that the congregation of individual's occurred when the Union Committee exited the meeting with Claudia Cecil and Steve Schultz walking 15 feet behind them. This is a borderline impossibility given the testimony and evidence presented at the hearing. Shenberger testified he was eating outside when the Grievant approached the group he was with to inform them that they should refuse the Company's offer of work. Had Schultz and Cecil been following the Grievant as he testified, they would have witnessed Grievant speaking

12

with Shenberger on the patio. They would have seen Grievant congregate the individuals in the plant. They would have heard Grievant direct the employees to refuse work. Rick Christenberry, Steve McNease and Larry Hyler who were already present, would have seen them. In fact, Christenberry specifically testified that when he saw the union meeting taking place, he immediately called Claudia Cecil to ask her if they were authorized to meet on work time. Cecil replied in the negative, and told Christenberry that she and Steve Schultz would go down to investigate what was happening. A few minutes later, Cecil and Schultz arrived, and witnessed the meeting.

## E.    GRIEVANT CAUSED, ENGAGED OR AUTHORIZED OTHER EMPLOYEES TO REFUSE WORK

Grievant testified that he did not specifically speak to the three individuals (Ruiz, Ramos and Brown) prior to the canvassing of employees. In fact, he testified that they didn't even volunteer to work at all. He did testify that he told them to "do what you have to do."

Grievants testimony is contradicted by seven witnesses, including two other Union members. Claudia Cecil, Steve Schultz, Steve McNease, Larry Hyler, Rick Christenberry, Sherrie Thompson and Rob Shenberger each testified that Grievant pulled aside the individuals who had just indicated they wanted to accept work during the canvassing. Each individual testified that Fells spoke privately with each employee, and that Grievant was gesticulating and appeared angry. Immediately after speaking with each employee, they approached Claudia Cecil to inform her that they would not be working "after all."

The only reasonable inference to be drawn from this behavior is that Grievant influenced each employee to refuse the work that they otherwise wanted (and actually requested) to perform.

13

1182742

The legal standard to determine whether a Union employee induces or encourages another employee to refuse work is analyzed in cases interpreting LMRA § 8(b)(4)(i)(6). While this section primarily deals with work stoppages against another company, it is analogous to the instant case insofar as it defines "induce or encourage" in the context of a union/management dispute over refusal to work. The United States Supreme Court has held that inducing and encouraging are "broad enough to include them in every form of influence and persuasion." *International Brotherhood of Electrical Workers v. NLRB*, 341 US 694, 701-02 (U.S. S. Ct. 1981). This language has been adopted by Federal Courts in more recent times, *Eber Brothers v. Teamsters Local 118*, (2005 WL 290142) (W.D.N.Y. 2005).

In addition, "inducement" has been interpreted as including statements by an agent of a labor unit to an employee that each member had the right to make up their own mind whether or not to strike. *NLRB v. Local Union 3*, 477 F.2d, 260, 264 (2d Cir. 1973).

The word induce is defined by Merriam-Webster's dictionary as "to move by persuasion or influence" and "to call forth or bring about by influence or stimulation."

Article 21 § 2 of the CBA states that an agent of the Union may not cause, engage in, or authorize any activity to interrupt work against the Company.

"Cause" is defined by Merriam-Webster's Dictionary as "to serve as cause or opportunity." "Engage," as a transitive verb, is defined as "to take part: participate" ("At college she engaged in gymnastics"). "Authorize" is defined as "to establish by or as if authority." (Merriam-Webster online Dictionary, 2008). The plain language of Article 21 §2 makes it clear that only one of these elements is necessary to prove a violation ("cause, engage in <u>or</u> authorize") (emphasis added).

14

1182742

Grievant caused the refusal of work by taking aside the three individuals who had verbally indicated they wanted to work and speaking to them in an animated fashion. While the exact words he uttered are not known, what is known is that Grievant appeared very angry, and that the reaction of the three was exactly the same -- each immediately went to Claudia Cecil and told her they could not work. Assumedly none of the three would have volunteered to work if they did not actually intend to do so. As such, it is clear that each person changed their mind because of their conversation with Grievant. This is the definition of cause; in this case, Grievant, by his actions, caused all three employees (none of whom were called to testify at the hearing by the Grievant) to refuse work. Not only were Grievant's actions a cause of their action, it appears to be the only cause of their sudden change of heart.

The same logic can be applied to the words "engage in" contained in Article 21, Section 2. It is clear that Grievant actively participated in this endeavor by pulling aside each employee who wanted to work, as well as personally refusing work.

Grievant authorized the refusal to work by utilizing his position with the Union to induce the three employees to refuse to work. Grievant does not dispute that he told the members to "do what you have to do" before Cecil canvassed the employees. He also admits to speaking to the employees of the importance of sticking together prior to the canvassing. There was nothing inherently wrong with these acts, but these came after Grievant specifically told Ms. Cecil, Mr. Schultz and Mr. Hyler that he was going to tell the employees to refuse work. And this is precisely what he did.

Finally, the testimony of the seven individuals who witnessed Grievant speaking with the employees who offered to work was remarkably consistent. All seven testified to his actions,

15

including the temporal relationship between his conversation and the employee's actions in immediately informing Cecil they could not work.

The Company has clearly met its burden by showing that Grievant caused, engaged in, and authorized a refusal to work, only one of which is necessary to prove a violation. Grievant's actions constituted a deliberate and contumacious attempt to interrupt work, and is a terminable offense.

## F.    THE NECESSITY OF WORK

As Schultz, Cecil, Hyler, Christenberry and McNease testified, as the Company actively engaged in an effort to find work for the employees after discovering the parts had been delivered. However, it is important to note that all five individuals testified that work still had to be completed on the Chrysler work order. The Chrysler work was delayed, not cancelled. The significance of the value of the work is that Grievant seemed to suggest (although this is a bit unclear) that voluntary work was less important to the Company. The record reveals that the work involved included work to complete the request to tear down the engines for the Company's sole customer, Chrysler. Plant manager Steve Schultz and Debbie Marshall testified as to the importance of maintaining the relationship and the cost (over $1,000 a minute) to the Company if work is stopped or interrupted.

## IV.    GRIEVANT ENGAGED IN INSUBORDINATION.

The CBA allows or termination of employees for "just cause." Article 10 §1. Grievants actions during the week of July 16 - 23, 2007 established "just cause" beyond any doubt. Leaving aside the CBA violations which have been discussed, his subsequent actions

16

conclusively establish "good cause" for his immediate termination and provide a separate and independent basis for termination.

On Thursday, July 19, 2007, the day after refusing to work (and ordering others to do the same), Makhalia Reitz witnessed Grievant entering the facility. Ms. Reitz witnessed Grievant in cafeteria (Reitz testified she specifically recalled being in the cafeteria because of the free coffee that was available) when she heard Ms. Cecil and Mr. Schultz ask Grievant to leave the premises. Grievant refused. Ms. Reitz testified the request was repeated to Grievant. Grievant again refused. Ms. Cecil then ordered Grievant to leave. Grievant refused, and Ms. Reitz testified Grievant asked her if she was going to call the police. Ms. Cecil continued to ask Grievant to leave, and Grievant continued to refuse.

On cross-examination by the Grievant's representative, Ms. Reitz testified she witnessed Fells holding up a paper (assumedly the sign-up sheet) to the other employees and while telling them there was a contract for 50 hours and that if the Union stood together, they would get paid for 50 hours of work.

Ms. Reitz testified on both cross/re-cross and direct/redirect that the aforementioned conversation was between Grievant and Schultz and Fells. Ms. Reitz' testimony was both consistent and credible.

Claudia Cecil testified to Grievants behavior. She testified she saw Grievant in the cafeteria. Cecil asked what he was doing and he stated that the plant was a "union shop," he was conducting unspecified "union business," and that he could do "whatever I wanted." When Cecil asked Grievant to leave, she testified he refused, and even told her that she should be the one who should leave the premises.

17

1182742

At this point, both Ms. Cecil and Mr. Schultz gave Grievant a direct order to leave. Grievant refused. Grievant asked to speak with Mr. Schultz alone, and after he was told this was not possible, Grievant asked Schultz if was "going top let a woman tell you what to do," a comment that was subsequently confirmed at the hearing by Mr. Schultz.

Realizing that Grievant was going to continue refuse to follow the orders, Mr. Schultz and Ms. Cecil went to Ms. Cecil's office to speak with Tom Littlejohn. Grievant physically attempted to enter the office; Ms. Cecil ordered him to return to the cafeteria.

Again, Grievant refused. In fact, he remained in close proximity by the glass panel of her office, intentionally attempting to listen to the conversation. Eventually, after speaking with Mr. Littlejohn, Grievant left the premises, but not for long. He returned, ostensibly to pick up his check, but remained on the premises in contravention of the direct orders which had been given to him.

Ms. Cecil's testimony was credible and corroborated by her contemporary written descriptions of the meetings (see joint Exhibits #3, #4 and #5). It is well settled that the most accurate recollection of events are written memorializations of the events created contemporaneously along with the incident. Ms. Cecils testimony was consistent and, although subjected to a rigorous cross-examination, held up to scrutiny.

Steve Schultz's testimony completes the narrative of Grievants events erratic and insubordinate behavior. At the July 18, 2007 meeting with employees (the "second meeting"), he observed Grievant berating a member of management, Steve McNease. Schultz intervened, stopping a bad situation from becoming much worse. Grievant then focused his wrath on Mr. Schultz himself. Mr. Schultz finally told Grievant that the discussion should be taken off line.

1182742

Steve Schultz testified that he became aware of a possible "incident" to occur the next day: Grievant was going to appear at work with the other employees. Schultz testified he arrived at the plant shortly after 6:00 a.m. Grievant had already entered the plant with the emergency key. When he walked in he saw Grievant telling other employees they had to sign pre-written grievances without having an opportunity to read them. Schultz stated that the employees did not have to sign documents they could not read first.

Schultz then testified he told Grievant to leave. Grievant refused and grew louder, more menacing and more agitated. He was given orders to leave, to which he answered with a question: "what are you going to do...call the cops?"

Claudia Cecil then arrived, and Schultz confirmed Cecil's testimony as to Grievant's subsequent insubordinate behavior, including his attempt to humiliate Schultz and Cecil by implying Schultz was not a "man" because he needed a woman present to speak with Grievant.

When asked to describe Grievant's behavior, he stated that aside from violating the CBA, the Grievant would not engage in a rational discussion, would not take any direction, and was acting insubordinate.

Grievant denied to characterization of his behavior. However, he is essentially left with his own testimony of what occurred, which included stating that Claudia Cecil was not in the cafeteria when the majority of events occurred. This was refuted by the testimony of three other individuals.

Essentially, Grievant's argument is that the eight individuals (including Ms. Reitz) who witnessed his actions on July 18-19, 2007 were simply lying. Included in the eight were two

19

Union members (Shenberger and Thompson) who had absolutely no motivation to lie under oath at a judicial proceeding. The Grievant continued to testify that the sign up sheet constituted a binding contract and that the CBA was not even in effect during the entire week in question -- theories that the Union's own leadership (Tom Littlejohn) repudiated at the hearing.

In addition, he must contend with the Company's written accounts of the events which were prepared by the Company contemporaneously with the events, and were provided to the Grievant and the Union at or about the time the incidents occurred.

In his approximate two years of employment, Grievant filed approximately one hundred grievances, filed a lawsuit against the Company's former HR manager (which he claims is still pending), filed charges of assault against other company personnel (Caper and Reese), filed a federal lawsuit alleging the Company discriminated against him for a number of reasons, filed claims with the Illinois Department of Human Rights alleging age discrimination, race discrimination, gender discrimination, retaliation for complaints of discrimination and sexual harassment.

In addition, Grievant filed claims that his termination was based upon complaints of safety hazards with OSHA, and has filed individual lawsuits against Claudia Cecil, Steve Schultz and Larry Hyler individually in Winnebago County Court.

To date, Grievant has not prevailed in any of these actions. This grievance should be no exception.

Premises considered, Grievants testimony is not credible. In order to accept Grievants position, one would have to conclude there has been a vast conspiracy against him, with no less

20

than eight individuals lying under oath. Accordingly, based upon the testimony of Reitz, Cecil, Schultz, McNease, Christenberry, Hyler, Shenberger and Thompson, the Grievants conduct provided just cause for termination under Article 10 § 1. The grievance should be denied on this basis as well.

## V.    GRIEVANTS TESTIMONY WAS NOT CREDIBLE

Grievants testimony and evidence presented, at the time could be best described as false, and at worst fraudulent.

Latissa Spears was a member of the Union Committee. Under direct examination at the hearing, Grievant testified that she (Spears) was told "several times" by Claudia Cecil that if she testified at his hearing, she would be terminated. Specifically, Grievant testified Spears was told she would "lose her job" if she testified.

Grievants testimony made under oath was a false allegation and had serious connotations. Grievant was testifying that a Union Committee person was being threatened with her job if she testified at his arbitration. If this were in fact true, there would be serious repercussions to the Company, and long lasting implications beyond his grievance/hearing.

Grievant's testimony was false.

Unbeknownst to Grievant, Spears did, in fact, end up testifying at his arbitration. She unequivocally stated she was never threatened by the Company. She testified she was never told she would or could lose her job for testifying at Grievant's hearing.

In sum, Grievant made a fraudulent representation to the Arbitrator.

21

Grievant also submitted a document to be entered into the record purporting to be a petition to have Grievant reinstated to his former position signed by employees. This document, like his testimony given regarding Ms. Spears, was, on its face, at best misleading and at worst fraudulent. A cursory examination of the "signatures" reveals names signed two or more times in different handwriting and five consecutive names with the same handwriting and signed with the same written instrument.

Grievant testified that he did not present a grievance at the meeting on July 18, 2007 with the Company. The record revealed the grievance was presented at the meeting and that Claudia Cecil signed the document at 10:15 a.m.

The relevance of these acts are that they preclude reinstatement even if he was able to prove the termination was not proper under the CBA.

In *Association of Flight Attendances v. Alaska Airlines, Inc.*, 2005 WL 2789054 (W.D. Wash. 2005), the District Court, upon review of an arbitrator's finding that there was no "just cause" for termination, upheld that the employee was not fired for just cause, but that reinstatement was inappropriate due to the Grievants post-termination conduct. The Court held that the Grievant's post-termination behavior, including borderline-fraudulent testimony, had caused the employee-employer relationship to deteriorate to the point that reinstatement was unreasonable. *Id.* The court noted that the Grievants conduct had "eroded the employee-employer relationship to the point it was no longer viable." The Court's decision was based upon the reasoned precedent set forth in *Association of Pulp and Paper Workers v. Rexam Graphic, Inc.*, 221 F.3d 1085, 1089 (9th Cir. 2000). In *Rexam*, the Court of Appeals upheld a similar decision by Arbitrator Sandra Smith, who found that the employer violated the CBA, but

22

the Grievant, by being untruthful at her hearing could not be reinstated on the basis of the resulting deterioration of the employer-employee relationship. *Id*. at 1087.

In *Rexam*, the Grievant was "untruthful" at the arbitration hearing and lied on her application for unemployment insurance benefits. The Company submits that Grievant Fells conduct was far worse than the Grievant in *Rexam*. The instant Grievant lied about non-existent threats to Latissa Spears, a fellow Union Committee member. Ms. Spears, of course, had absolutely no reason to be untruthful, and in fact was part of the Local #1268's Union Committee at the time. Grievant's testimony evidenced an utter disregard for the sanctity of the proceedings. Based upon the aforementioned acts of Grievant, in the event the Arbitrator finds that the termination was not consistent with the CBA, Grievant should not be reinstated under any circumstance.

The Company also presented evidence of Grievants pre-termination behavior which was, at the very least, disruptive. Testimony was elicited from individuals (including Mindy Nitz) who felt threatened to the point they began keeping written notes of any interactions they had with the Grievant.

The hostility of Grievant was evident at the hearing. When Robbie Shenberger testified that Grievant told Union members to refuse work, Grievant spoke loudly, and Mr. Shenberger was threatened that he would be dealt with "at the plant tomorrow." This type of reprehensible behavior occurred all through Grievants employment with the Company, and was just one example of the poisonous environment that Grievant created. It is disturbing to ponder the repercussion of Grievant being reinstated to his former position in light of his pre and post termination conduct.

23

Two points are necessary to make at this point. First, by setting forth the proposition that Grievant should not be reinstated due to the similar situations in *Rexam* and *Alaska Airlines*, this should not be construed to imply Grievant has a meritorious argument that his termination did not comport with the terms of the CBA. The termination was justified. There are three separate basis for upholding the termination (work interruption, conducting an illegal meeting, and just cause). Each aspect has been proven to be a valid independent reason to terminate Grievant. However, given the extreme behavior of Grievant, it bears mentioning that reconciliation, in any circumstance, is not possible, and Grievant has no one else to blame other than himself.

Secondly, evidence of Grievants action as an employee at the hearing quickly devolved into an examination of his popularity as Unit Chairperson for the Union. Such evidence is irrelevant as the CBA does not mention popularity as a factor in determining whether an employee may be terminated. The Company presented the evidence of Grievant's actions as being disruptive and destructive for everyone involved, whether with the Company or with the Union. The Company is not asserting that evidence presented at the hearing by either side as to personal feelings individuals had toward the Grievant as being germane to the issues currently before the Arbitrator. It is relevant as to the relationship of the two parties, particularly with regards to his post-termination conduct.

## VII.    FINDINGS OF FACT AND TESTIMONY AT HEARING

The arbitration was conducted on February 11, 2008, March 10, 2008 and April 14, 2008. The Union was represented by George Campa and the Company was represented by Chris Henson. There were no issues regarding jurisdiction or arbitrability of the grievance. Opening statements were presented on February 11, 2008, and the Company began its' case-in-chief.

1182742

Claudia Cecil was the first witness called by the Company. Ms. Cecil was the Director of Human Resources for the Company.

Ms. Cecil testified as to the events of July 16 - 23, 2007. Upon realizing that the parts from the Venezuelan engines were not going to arrive in a timely manner, the Company came up with a proposal that called for ten employees to be kept on July 18, 2007, thirteen the next day, and that work would continue day to day until the project was completed.

Cecil testified that the Company (consisting of Steve Schultz, Larry Hyler and herself) met with the Union Committee (Grievant, Bryan Gary, Marcia McIntosh and Latissa Spears) on the morning of July 18, 2007. The options were presented to the Committee. Grievant became belligerent, and stated that the sign up sheet constituted a binding contract. (Union Exhibit #4). Grievant also handed Cecil a grievance which had been prepared prior to the meeting. Cecil signed the acknowledgement at 10:15 a.m. (Company Exhibit #3). Ms. Cecil testified that the CBA did not apply because the week of July 16 - 23, 2007 was originally scheduled as a "down week." Cecil informed him the CBA always applied. Grievant continued to argue vociferously until the Company stated the Committee should present the offer to the employees.

Claudia Cecil also testified that the Grievant said he "shouldn't have to stay for a B.S. meeting" and that he would "take them out," in reference to telling the workers to refuse work at the time and leave.

Cecil testified that approximately 15 minutes after the meeting she went to the plant floor and saw Grievant talking with the employees. She testified that they should have been working because the lunch break was over.

25

Ms. Cecil then canvassed the group to find volunteers and systematically went down the roster asking who wanted to work. Three individuals (Brown, Cipriano and Ruiz) stated affirmatively that they wanted to work. After stating this, Grievant motioned or pulled each employee away and spoke to them in an animated manner. Grievant appeared angry. Cecil testified that each individually subsequently walked up to her and stated they "couldn't work after all." Cecil informed the gathered employees that if they changed their mind, they could call her, and they would be placed on the roster. The employees then returned to finish the work, which lasted approximately another thirty minutes.

Later that day, Cecil heard a rumor that the people who refused work (including Grievant) would return the next day.

The next day the Grievant did arrive. Ms. Cecil was in the cafeteria with Larry Hyler and Steve Schultz. Grievant then entered the cafeteria, and Cecil testified she told him that he needed to leave because he had refused work the day before.

Cecil testified Grievant became obstinate, and stated "this was a union shop" and that he was conducting Union business. Cecil repeated that Grievant needed to leave. Grievant replied that she didn't belong on the premises so she should leave.

At this point, Cecil and Schultz gave Grievant a direct order to leave. Again, he refused, and repeated that Cecil should leave. Grievant then asked to speak with Schultz alone "man to man." When Ms. Cecil said this was not possible, Grievant asked Mr. Schultz if he was going to let a woman tell him what to do.

1182742

According to Cecil, they then went to her office to call Tom Littlejohn from the Union. Grievant followed and was twice asked to return to the cafeteria. Grievant refused, and even attempted to enter her office.

He eventually exited her office and stood outside a glass panel in an attempt to eavesdrop on the conversation.

Ms. Cecil then testified when she called Mr. Littlejohn, the phone was busy. Eventually she got through to him. Ms. Cecil and Mr. Schultz told Mr. Littlejohn what happened, and Mr. Littlejohn expressed his displeasure at Grievants actions, stating that Grievant should not have refused work.

Mr. Littlejohn also stated Grievant should have accepted the hours and then grieved the issue. He then replied he would get the Grievant out of the plant. She then witnessed Grievant speak with Mr. Littlejohn, then finally exit the facility.

Grievant again returned to the plant later that day. He refused to leave. She called Tom Littlejohn, explained the situation, and Mr. Littlejohn told her he would make sure Grievant left. A moment later, she saw Grievant answer his cell phone then leave.

Mr. Cecil testified that Grievant was terminated for disrupting the workplace, telling people they could not work, engaging in a work stoppage, and acting insubordinate.

Bob Wagner was called as the next witness. Mr. Wagner at one time was operating manager for the Company, but is now retired.

Mr. Wagner testified to a situation in 2006 where the Grievant screamed at him, stating the Union would only work eight hours on a particular shift. Mr. Wagner told him to call the Union, and reminded him that he (Wagner) was running the plant, not him.

Mr. Wagner testified that the CBA is always in effect. He also testified that the proper procedure in the instant case would be for Grievant to accept the work that was offered and then, if not satisfied, file a grievance. Under no circumstance should an individual refuse work.

Angie Dieterlin and Mindy Nitz were called as witnesses next by the Company. Both testified as to the intimidating manner by which Grievant regularly utilized in dealing with management. Ms. Nitz went so far as to testify that Grievant acted so hostile towards her that she kept a journal of all interactions she had with him. (Company Exhibit #4).

Doug Self worked in the support team for three years. He testified that he normally worked from 7:00 p.m. to 8:00 a.m.

Self personally witnessed Grievant's insubordination while at work, telling Company supervisors that he did not have to follow orders because he was "Unit chairperson." He witnessed Grievant on three occasions refusing to work.

The Company next called Rick Christenberry as a witness.

Mr. Christenberry was standing with Steve McNease after lunch in the plant on July 18, 2007 when he witnessed Grievant meeting with the other employees. Steve McNease asked Grievant what he was doing and Mr. Christenberry decided to call Ms. Cecil to ask if Grievant had permission to conduct a meeting.

28

Importantly, Grievant affirmatively testified that neither Mr. Schultz nor Ms. Cecil had been following Grievant to the second meeting.

Ms. Cecil confirmed to Mr. Christenberry that it was after lunch and Grievant should be working. Ms. Cecil told Christenberry she would be there in a "few minutes."

When Ms. Cecil and Mr. Schultz did arrive, Mr. Christenberry reiterated Ms. Cecil's version of events. Specifically, he testified Cecil canvassed the employees about work by reading names from a list. He further testified three individuals (Christenberry specifically recalled Adrian Ruiz as one of the three) volunteered for work. Christenberry testified Grievant "tapped her on the shoulder," spoke to her in an angry manner, and she returned to Ms. Cecil and stated "I guess I can't arrive after all." He stated that this occurred with the other two individuals as well.

On re-direct examination, Mr. Christenberry testified "it was painfully obvious" that Grievant wanted everyone to refuse" work. He recalled telling Larry Hyler at the time that the Grievant should have told "everyone to work." He also affirmatively stated that the Company needed individuals to complete the job. Christenberry's testimony is credible and corroborates the testimony of Cecil.

The Company next called Sherrie Thompson to the stand. Ms. Thompson was an hourly employee who was a member of UAW Local #1268. Ms. Thompson testified that Grievant told the members to stick together, which she inferred was a reference to refusing work.

Regarding the 50 hours, she testified she heard Grievant say (paraphrasing him) "don't work - get 50 hours." (pay).

1182742

She too witnessed the canvassing and Grievants subsequent behavior. She specifically recalled Grievant motioning away two employees who volunteered for work (she specifically identified "Cipriano" and a "pretty girl from IP" -- Ms. Ruiz). She confirmed that these individuals immediately changed their minds about working after speaking with Grievant and told Cecil they could not work. Thompson herself subsequently told Cecil and Hyler she did want to work the remaining days -- but not in the presence of the Grievant. Thompson also testified that this meeting occurred well after she returned to work after lunch, and that she had work remaining to do after the impromptu meeting with Grievant.

Thompsons cross-examination was notable for her statement that Grievant was helpful to employees outside the plant. Her testimony shows that she does not have a personal grudge against Grievant, and that she was at the hearing simply to testify as to the truth.

Larry Hyler was called next to testify. It should be noted that Bryan Gary would subsequently take one line from his testimony and completely distort the context and inferences drawn from the statement.

At the hearing, Hyler testified that everyone was lying. Gary used it as evidence that the Company was being untruthful.

Nothing could be further from the truth.

The actual exchange occurred during his direct examination. Hyler was asked about the individuals who initially volunteered for work who then, after speaking with Grievant, told Cecil they "could not work." In his explanation, he said "everyone was there" (referring to Grievant and the Union Committee), and that everyone saying they didn't see it "was lying" (again,

referring to Grievants "persuasion" of the three employees who volunteered to work that they could not do so). The testimony was solely directed the fact that anybody who was present who denied Grievant engaged in such actions was being untruthful.

Larry Hyler testified that Grievant was informed of the problems with shipment on Tuesday July 17, 2007 -- which would explain why Grievant would appear the next morning with a grievance already prepared in his hand.

Hyler also confirmed that the Union Committee went to the floor after the meeting but well before the Company came out. Hyler's description of the incident was identical to the other witnesses testimony. He added that he was standing only 10-15 feet from Grievant when he pulled the three volunteers aside. He also testified that a Grievant appeared animated and angry while speaking to the workers who volunteered for work.

In regards to the first meeting, Hyler confirmed it was a heated exchange, with Grievant continually demanding that all employees be paid for 50 hours of work. Hyler responded by stating that if the Company paid the employees for not working "we would both be fired, because that is stealing from the Company."

Larry Hyler used to work in the Union and, combined with his Company experience, had dealt with Union/management issues and disagreements under various CBA's for 35 years. Like everyone who testified other than Grievant, the proper procedure was to accept the work offered and then later file a grievance if the individual believed he or she was entitled to additional wages.

31

Debbie Marshall was subsequently called as a witness. She confirmed Bob Wagner's testimony regarding Grievants prior gross insubordination. In addition, she addressed Grievant's subsequent implication that the decision to terminate Grievant was race related -- having worked for an employer that did discriminate (Ms. Marshall is white, her husband is black) -- by stating, without equivocation, that she never witnessed discrimination at the plant.

The final witness for the Company's case-in-chief was Steve Schultz.

In addition to being a plant manager, Mr. Schultz had been a Union member with UAW Local #1268.

Mr. Schultz testified that Grievant was informed of the delay in expected parts on Tuesday, July 17, 2007.

On the 18th, the Company (Schultz, Hyler and Cecil) met with Grievant and the Committee to discuss the situation. The Company offered work for thirteen employees that day, ten employees on Thursday and additional work on Friday and Saturday. Grievant replied that the offer was unacceptable; he demanded the employees be paid 50 hours regardless of the unexpected issues that arose during the week that necessitated the change.

He also testified that he had never observed a situation where a company, as a result of an unanticipated stoppage, paid the employees for time they did not work. Mr. Schultz identified the discrepancy in Grievant asserting the CBA did not apply, yet later using the CBA as the basis for his subsequent grievances. He reiterated that Ms. Cecil informed Grievant that a walkout (which he was threatening) would constitute an illegal strike. He also testified as to the considerable amount of time spent in a vain attempt to inform him that a voluntary sign-up sheet

32

did not constitute a contract.  The meeting ended when it was clear nothing was going to be accomplished by attempting to reason with Grievant.

Schultz then testified as to about the gathering of employees around Grievant after the meeting with the Company.  This was an illegal meeting specifically prohibited by the CBA.  He also testified that he hand vote witnessed by McNease constituted a violation the CBA.  He confirmed the three individuals volunteering to work before being approached by Grievant.  He testified their words were "I guess I can't work after all."  He witnessed Grievant screaming at Steve McNease, and told him it was inappropriate for him to speak with him in such a loud voice, and that any further discussion should be taken "offline."

Like Ms. Cecil, he heard that Grievant and the workers would be showing up the next day, which in fact they did.

His description of the events of July 19, 2007 was virtually verbatim to Ms. Cecil's testimony.  He reiterated that Grievant was asked to leave several times, which eventually went from being request to a direct order.  He confirmed that it was Grievant who brought up the issue of calling the police.  He confirmed Grievants insistence that he was entitled to be on the premises to conduct unspecified union business.  Mr. Schultz repeated the testimony that Grievant attempted to enter Ms. Cecils office, refused an order to return to the cafeteria, and attempted to listen in on their conversation with Tom Littlejohn.  Significantly, he reiterated Cecils testimony that Mr. Littlejohn admitted during the conversation that the Grievant was

33

wrong, that it was never proper to refuse work, and that he should have later filed a grievance[3] after working the hours.

Mr. Schultz's testimony was consistent with the prior testimony, as well as the written record taken at the time by Ms. Cecil. Mr. Schultz's testimony conclusively established that:

1. Grievant refused work;
2. Grievant ordered others to refuse work;
3. Grievant held an illegal Union meeting on Company time/premises; and
4. Grievant was grossly insubordinate.

During rebuttal, the Company called Robbie Shenberger, whose testimony may have been the most important of any witness. While his testimony was discussed earlier, he testified:

- Grievant directed the employees who were on their lunch break on the patio that they should refuse work;

- the employees returned to work after lunch;

- Grievant assembled the workers;

- Grievant, in a "strong voice," told the employees to refuse the work that was being offered by the Company;

- confirmed, again, that the employees who volunteered for work were pulled aside and spoken to by the Grievant, who was visibly agitated.

---

[3]    Mr. Schultz testified that the Union and Company might differ as to their interpretation as to hours, but that this issue could be resolved in a later grievance. However, it was not proper for the Grievant to simply refuse to work and coerce others to do the same.

Like Thompson, Shenberger was/is an hourly Union employee[4] who stood to gain nothing from testifying. Indeed, when he testified at the hearing that Grievant verbally directed the employees not to work -- direct evidence of a violation of Article 21 - verbal threats were uttered toward him, including one implying that he would be dealt with when he returned to work the next day. The nexus necessary between Grievant's actions and the violations of the CBA was conclusively established by a Union employee.

## VIII.   TESTIMONY/EVIDENCE OFFERED IN FAVOR OF GRIEVANT

The Grievants testimony has been discussed. There were several witnesses who testified on Grievant's behalf. Many of the witnesses provided character witness evidence which, aside from the limited exceptions previously noted, are irrelevant. However, there are a few issues that need to be addressed.

First, Bryan Gary's mischaracterization of Larry Hyler's testimony. At no time did Hyler testify the Company was lying, and he is fact was referring to those individuals who denied that Grievant pulled aside the employees who wanted to work to coerce them into not working.

Second, John Randal attempted to portray a situation in 2006 as similar to the instant case. Randal testified that the Company mandated overtime without informing the employees prior to lunch (four hours) that overtime would be required. This was in violation of the CBA. In this case, there was no violation of the CBA, and the company was doing everything in its ability to provide work and complete the assignment of Chrysler. The two situations, even if Randal's assertions are true, are not analogous.

---

[4]    The first question asked by the Union during cross-examination was if he had a relative in a management.

35

1182742

Third, there is no issue regarding violation of Article 21. Termination is an appropriate remedy, as admitted by Grievant himself. Taken in conjunction with the acts of insubordination and conducting an illegal meeting, there is no doubt that the punishment fit the crime. The termination of Jimmy Fells was proper under the express terms of the CBA.

## CONCLUSION

The evidence overwhelmingly shows that Grievant violated three sections of the CBA, each of which is a terminable offense. The company prays that the grievance be denied in its entirety.

Respectfully submitted,

/S/
_____

CHRISTOPHER R. HENSON
CLAUSEN MILLER P.C.

JOHN M. HYNES
CHRISTOPHER R. HENSON
CLAUSEN MILLER P.C.
10 South LaSalle Street
Chicago, Illinois 60603-1098
312-855-1010 (ph)
312-606-7777 (fax)

Attorneys for Company, ANDROID INDUSTRIES

36

Exhibit #8

IN THE MATTER OF ARBITRATION )
                             )
           BETWEEN           )     May 9, 2008
                             )     Grievance #07-078
ANDROID-BELVIDERE, LLC       )          Before
                             )     Arbitrator Raymond E. McAlpin
           AND               )     FMCS 07-04848
                             )
INTERNATIONAL UNION UAW      )
   AND IT'S LOCAL 1268#4     )

## POST-HEARING BRIEF

### THE ISSUE

The issue before the arbitrator is to determine whether or not the discharge of Unit Chairman Jimmy Fells was for cause and if not, what is the appropriate remedy?

### PERTINENT CONTRACT PROVISIONS

1. Article – 1 Introduction Section 2 – Mutual Trust
2. Article – 2 Commitments and responsibilities – Section 3 – Common Goals and Section 4 – Ai Leadership responsibilities
3. Article 7 – Representation – Section 1, 2 & 4
4. Article 10 – Team Member Corrective Action Section 1 & 2
5. Article 11 – Problem Resolution Procedure
6. Article 21 – No Strike/ No Lockout

### BACKGROUND

The Company hired the grievant on June 16, 2005 as an assembler. He was elected their first Unit Chairman in May 2006. Mr. Jimmy Fells was terminated allegedly for misconduct and insubordination under Article 21 Section 2 (No Work Interruptions) for an incident that occurred on July 18, 2007.

The discharge of the Grievant was concocted from the beginning because of Management dislike for him because of his thorough and aggressive Union leadership position. Mr. Fells is the Unit Chairman and, while he has special obligation to make sure that there is no work stoppage, by the same token he should not be singled out because of his Union position.

## THE FACTS

The Company and the Union had entered into an agreement that employees would be canvassed to work during the week of July 16, 2007. This week was the annual shutdown week for the customer (Chrysler). Employees were asked to sign a document (Union Exhibit # 3) that they would be working five (5) days of ten (10) hours each day. For a total of fifty (50) hours for the week. On July 18, 2007, the Company Representatives had a meeting with the Union Committee to tell them that some of the trucks with the engines had not arrived. This would mean that they would have to lay off some of the employees and reduce the hours. This was not well received by the employees. In some cases that knocked out the employees from collecting unemployment benefits. They were upset and they didn't want to work the balance of the week.

The Company Representative (Claudia Cecil) canvassed the employees and they turned down the balance of the week with the exception of three employees. Later on those three employees turned down the work. The Company blamed the Union Representative Jimmy Fells of assembling and telling the employees to refuse the work. As you heard from John Randall's statement and testimony (Union

Exhibit #5) that was not true. The people were already gathered because there was no work to be done and they wanted information from the elected representatives as to what was the status for the balance of the work week? He also stated that the Company Representatives were only a few steps behind the Union Representatives, this would indicate that the Union Representatives did not gather the people.

Supervisor Steve McNeese testified that he saw the employees taking a vote by show of hands. Mr. Randall testified that never happen. Ms. Sherry Thompson testified that Mr. Fells didn't force anyone not to work the only words that she said that he said were "just stick together". She was asked if Mr. Fells use the words "don't work? She replied "no" just stick together". She refused the work and then later called Ms. Cecil to let her know that she wanted to work. She did work the balance of the week.

The Union Representatives had a meeting with the people at the Local Union Hall where Bill Campbell (Financial Secretary) told them to report to work the next day because they had volunteered for the work and he didn't want anyone to get into trouble. All employees reported to work on July 19, 2007 and they were threaten by the Company Representatives that if they didn't leave they would call the police. So, the employees left and they did report the following day July 20, 2007 and were sent home. The Company had called in temporary help they didn't follow the collective bargaining agreement by calling in the next senior employees. The Company also violated the CBA under Article 7 – Representation, Section 1 Union Positions a union representative should have been scheduled and they didn't allow one in the plant.

Mr. Larry Hyler, Assistant Plant Manager testified that everyone that had given testimony before him was lying. He was going to tell the truth. He said that Mr. Fells had an angry look on his face and that he was the only one that saw that. Would this be grounds for termination?

Mr. Fells was charged with numerous violations from July 18 through July 20, 2007. All these violations were fabricated and are falsehoods. Even if Mr. Fells had committed all of these violations the Company was going to suspend Mr. Fells for a period of 22 days. How did this suspension turn to a discharge? On July 23, 2007 the Company wanted the Union to pick and choose which representative would stay and who would be discharged? The Union position was that each individual case would be based on its own merits. Because the Union didn't buy into their strong arm tactics, the Company decided to terminate both Jimmy Fells and the 2nd Shift Union Representative. Was this a fair decision?

## UNION'S POSITION

Under <u>Metropolitan Edison Co. v. NLRB.</u> 460 U.S. 693 (1983)[1] the Union

---

[1] Metropolitan Edison Co. V. NLRB. 460 U.S. 693 (1983) In the absence of an explicit contractual duty, the imposition of more severe sanctions on union officials than on other employees for participating in an unlawful work stoppage violates 8(a) (3).

(a) Section 8(a)(3) not only proscribes discrimination that affects union membership, it also makes unlawful discrimination against employees who participate in concerted activities protected by 7 of the Act. Holding union office clearly falls within such protected activities, and an employer's

contends, first that it was against the law to single out J. Fells for more severe

discipline on basis of this Union position.  Under the law, the Union argues, the only

valid basis for disciplining a union steward more harshly than other participants in

connection with an illegal work stoppage is 1) where the collective bargaining

agreement imposes an affirmative duty on union officers to end work stoppages and

the officers refuse to do so; or 2) where a union officer was the instigator or active

leader of the strike.  Neither of these conditions has been met here.  Fells, took

immediate action to end what the Company perceived to be an illegal strike.  All

employees reported to work the following two days (July 19 & 20, 2007) and they

finished the day (July 18, 2007) and left after management released them.  In

addition the evidence falls short of establishing that a strike or work stoppage

occurred there were no engines to be torn down and it didn't stop production at the

Chrysler Plant.  Further, the Union maintains, the evidence is insufficient to show

that Fells was an instigator or leader of what the Company perceived as a strike or

work stoppage.

The Union contends that this was not a work stoppage but a break violation.

---

unilateral imposition of discipline on union official inhibits qualified employees from holding
office.  While the disruptive effect of wildcat strikes makes it important to ensure compliance with
no-strike clauses, it does not follow that an employer may assume that a union official is required
to attempt to enforce a no-strike clause by complying with the employer's directions, and may
impose a penalty on the official for declining to comply.  The imposition of such penalty violates
8(a)(3).  The Board's decision here furthers Congress' policy in seeking to avoid the dilemma
presented to the union official whereby his failure to comply with the employer's direction would
place his job in jeopardy but compliance might cause him to take actions that would diminish the
respect and authority necessary to perform his job as a union official.
(b)  While a union may waive the protection afforded union official against the imposition or more
severe sanctions than those imposed on other employees for participating in an unlawful work
stoppage, no waiver occurred here.  Such a waiver must be clear an unmistakable, and the two
prior arbitration awards did not establish a pattern of decisions clear enough to convert the union's
silence after those awards were made into a binding waiver.  There in no showing that the parties
intended to incorporate those awards into the subsequent agreement.

There is a difference between an extended break and work stoppage. After the meeting all employees returned to their work assignments immediately and made no demand of the Company as a condition of resuming work wouldn't that show that their intention was not to harm the Company or gain some concession but only to express their objection to what they believed was a contract for 50 hours.

## CONCLUSION

The Union filed a grievance on behalf of the grievant, and it was properly before the Arbitrator. The Union will proved based on all circumstances in this case that the discharge was not for proper cause. The Union is requesting that the arbitrator sustains the grievance and the grievant is made whole.

Respectfully,


George R. Campa
UAW, International Representative
Lincolnshire Regional Office

Exhibit #(9)

IN THE MATTER OF ARBITRATION

BETWEEN

ANDROID INDUSTRIES

AND

INTERNATIONAL UNION UNITED
AUTO WORKERS AND ITS LOCAL 1268 #4

) Arbitration Award:
) Discharge of Jimmy Fells
) Grievance #07-078
) FMCS Case No. 07-04848
)
) Before Raymond E. McAlpin,
)    Arbitrator
)
)
)
)
)
)

## APPEARANCES

For the Employer:

Christopher Henson, Attorney
Claudia Cecil, Human Resources Manager
Sherie Thompson, Team Leader
Mary Hefler, Consultant
Steven Schultz, Plant Manager
Letisia Spears, Assembler
Robert Wagner, Operations Manager-Retired
Angie Dieterlent, Human Resources Payroll
Mindy Nitz, Human Resources Generalist
Doug Self, Corporate Operations Manager
Rick Christenberry, Operations Manager
Steven McNeese, Shift Manager
Larry Hiler, Consultant
Debra Marshall, Shift Manager
Robert Schenberger, Assembler

For the Union:

George Campa, Region 4 UAW Servicing Representative
Jimmy Fells, Grievant
Marcia McIntosh, Unit 4 Committee Representative
Bryan Gary, Unit 4 Committee Representative
Frankletta Pearson, UAW Member
Raquel Hughes, UAW Member
Juamual Pitt, Acting Unit 4 Committee Representative
Stan Etienne, UAW Member

1

Joel Richards, UAW Member
Bill Campbell, Financial Secretary, Local 1268
Sanietia Logan, UAW Member
John Randall, Former Employee

## PROCEEDINGS

The Parties were unable to reach a mutually satisfactory settlement of a certain grievance and, therefore, submitted the matter to arbitration pursuant to Article XI, Sections 2 through 5 of the Collective Bargaining Agreement dated January 19, 2006 through July 19, 2010. The hearings were held in Rockford, Illinois on February 12, 2008, March 10, 2008 and April 14, 2008. At this hearing the Parties were afforded an opportunity to present oral and written evidence, to examine and cross-examine witnesses, and to make such arguments as were deemed pertinent. The Parties stipulated that all provisions of the Collective Bargaining Agreement had been complied with and that the matter is properly before the Arbitrator. Final briefs were received on May 9, 2008.

## ISSUE

The Parties stipulated to the following issues at the hearing:

Was Jimmy Fells discharged for just cause? If not, what is the remedy?

## PERTINENT CONTRACT PROVISIONS

## ARTICLE 21

Section 2: no work interruptions during this Agreement's term, (n)either (sic) the Union nor its agent's will cause, engage in, or authorize its members to engage in any strike, sympathy strike, work stoppage, picketing, boycott, sick-out, slowdown or other concerted activity to interrupt work against AI.

Section 3 - Discipline: Team members who engage in any activity specified in the paragraph above are subject to discipline up to and including discharge subject to review in Problem Resolution Procedure.

## ARTICLE 7

Section 5 - In-Plant Voting: AI will allow "in-plant" voting for Union representatives and Officers of the Local; provided elections are held at break time and before and directly after any shift.  It is understood that team members will not leave work stations to vote during working hours.

## ARTICLE 10

Section 1: which provides termination as a remedy for "just cause."

## OTHER PERTINENT CONTRACT PROVISIONS

Article 1, Section 2
Article 2, Sections 2, 3 and 4
Article 7, Sections 1, 2 and 4
Article 10, Sections 1 and 2

3

Article 11 – Problem Resolution Procedure

## EMPLOYER POSITION

The following represents the arguments and contentions made on behalf of the Employer:

The Grievant was Unit Chairperson for UAW Local 1268 at all relevant times up until the time of his termination on July 23, 2007.

July 16 to 23, 2007 was a scheduled down week for the company. Chrysler, which is the sole customer of this facility, asked that AI break down a number of engines from Venezuela. Even though this is not normal work for AI, the Employer agreed to complete the requested work. The best time to perform this work would be during the down week. The Employer created a sign-up sheet for volunteers. Once the requisite number of employees had volunteered, the Employer informed Chrysler that the work would be completed by July 23.

Early on in the process the Employer became aware of a problem with the delivery of the engines to the Belvedere facility. The Employer informed the Grievant on Tuesday night of that week that the engines were not going to arrive as scheduled and that alternative plans would have to be made for the work to be completed. The Employer was expecting the engines

4

to arrive later in the week so it was necessary to reschedule. The Grievant for his part insisted that a contract had been entered into by virtue of the signature sheet and that the employees were entitled to 50 hours of pay regardless of whether or not the work was available. The Grievant stated that he wasn't going to let the employees work unless they got their 50 hours pay. Neither the Grievant nor anyone else from the Union disputed the description of the Grievant's conversation with management until the time of the hearing.

The Grievant told a number of employees that they had been guaranteed 50 hours of work and that employees should refuse work offered them by the Employer. It appeared to the Employer that the Grievant conducted a Union meeting on Employer time in an Employer work area. After the apparent Union meeting was virtually over Claudia Cecil and Steve Schultz canvassed employees to see if they wanted to work. Three employees indicated that they did. A short time later they changed their minds after discussing the matter with the Grievant.

The following day the Grievant showed up for work along with other Union members whom he had told not to work the previous day. Apparently, Local 1268 leadership told the Grievant he should never refuse work and instructed him to go to work even though he had refused the original offer. The Grievant was telling employees that they had to sign grievances without even affording them the opportunity to read the document prior to signing. The Grievant was asked to leave the premises and was told that, if he wished to conduct Union business, it should not be on Employer property. The Grievant threatened the Human

5

Resources manager stating that she would be terminated.

The Employer called the president of Local 1268 stating that the Grievant was acting irrational. It was admitted to the Employer that the matter was handled incorrectly by the Grievant and that the members should not have refused work. The Local president then spoke with the Grievant and the Grievant and the Union committee left the plant. The Grievant subsequently returned to the plant that day against explicit orders from the Employer. The Employer terminated both the Grievant and Bryan Gary who were both presented with two options. In a 15-page decision the arbitrator denied Gary's grievance holding that his termination was proper.

The Grievant violated Article 21, Section 2 of the Collective Bargaining Agreement. The Grievant essentially argued that he did not tell Union members to refuse work, therefore, he did not violate the Collective Bargaining Agreement. The record shows that the Grievant's argument is simply untenable. None of the Grievants' excuses was proper including the fact that the Collective Bargaining Agreement did not apply because it was initially scheduled as a down week. The sign-up sheet constituted a contract which legally obligated the Employer to pay the employees 50 hours of pay even if there was no work available. He should not have to listen to a BS meeting and he would tell other employees to leave after being informed that this would be illegal under the Collective Bargaining Agreement. The Grievant stated that it was legal because the Employer was refusing to let people work.

6

The facts are that the Collective Bargaining Agreement is in effect at all times. This was also the testimony of the Local Union president. There is no provision in the Collective Bargaining Agreement for situations in which it is not in full force and effect. The CBA explicitly states that it is to remain in effect during the duration of the Agreement.

The sign-up sheet did not constitute a contract. The Grievant asserted that this sign-up sheet created a binding contract guaranteeing the employee 50 hours of pay regardless of work. The mistake which occurred was both unexpected and not the fault of the Employer. In situations where no work is available there is still no expectation of pay even though an employee would have a legitimate expectation of working a full shift. Unexpected down time occurs and there is no provision in the Collective Bargaining Agreement that would allow for pay under the circumstances of this case.

In addition inducing other employees not to work is in direct violation of the Collective Bargaining Agreement. The Grievant took it upon himself to interfere with employees who affirmatively stated that they wanted to work. Even though the work was voluntary, it does not negate the fact that the work was necessary to complete Chrysler's order. In addition the Grievant held an illegal meeting during work hours and on company property. During these illegal meetings the Grievant caused, engaged or authorized other employees to refuse work. The Grievant's testimony that he did not engage in insubordinate activity was contradicted by seven witnesses including two Union members. The Employer provided numerous citations that would uphold the discharge on this basis alone. The Grievant utilized his position with

7

the Union to induce employees to refuse work. The work that needed to be done was necessary in order to complete the work order. The Chrysler work was delayed but not cancelled.

The Grievant also engaged in insubordination. On July 19, 2007 the Grievant was told to leave the facility which he refused to do. The Grievant was asked on several occasions to leave the facility and he continued to refuse. The Grievant was given a direct order to leave by Ms. Cecil and Mr. Schultz and, again, he refused.

The Employer attempted to get in touch with the Local president. The Grievant attempted to enter the human resource office during this process. The Grievant was ordered to return to the cafeteria and, again, he refused. The facts are that the Grievant engaged in erratic and insubordinate behavior. The Grievant has filed numerous claims in other venues. He has not been successful in any of those actions. This grievance should be the same.

The Grievant's testimony is simply not credible. It is best described as false and at worst as fraudulent. The Employer cited numerous instances where the Grievant's testimony was false. The Employer provided a number of citations in support of this position. The Grievant's pre-termination behavior was at the very least disruptive. Individuals testified that they felt threatened to the point of keeping written notes of any interactions they had with the Grievant. The hostility of the Grievant was evident at the hearing. The Employer's position is that reconciliation with the Grievant is simply not possible, and the Grievant has no one else to blame other than himself. The Employer stated that the testimony at the hearing supported

8

its position and gave numerous supporting examples.

Much of the testimony/evidence offered in favor of the Grievant was basically mis-characterization or misconception. Termination is an appropriate remedy as admitted by the Grievant himself. Taken in conjunction with the acts of insubordination and conducting illegal meetings, there is no doubt that the punishment fits the crime. The Grievant violated three sections of the Collective Bargaining Agreement each of which is a terminable offense, and the grievance should be denied in its entirety.

## UNION POSITION

The following represents the arguments and contentions made on behalf of the Union:

The Grievant was elected the first unit chairman for Android Industries - Belvedere during May, 2006. He was terminated for alleged misconduct and insubordination under Article 21.2 for incidents that occurred on July 18, 2007. The discharge was concocted from the beginning because of management dislike for the Grievant because of his thorough and aggressive Union leadership. The Grievant is the unit chairman and, while he has special obligation to make sure that there is no work stoppage, he should not be singled out because of his Union position.

9

The Employer and the Union had entered into an agreement that employees would be canvassed to work during the week of July 16, 2007. This week coincided with the annual shut-down for both AI and Chrysler. Employees were asked to sign a document that they would be working five 10-hour days for a total of 50 hours for the week. On July 18, 2007 Employer representatives had a meeting with the Union committee to tell them that some of the trucks with the engines had not arrived. That would mean that they would have to layoff some employees and reduce the hours. This was not well received by the employees. In some cases they were precluded from collecting unemployment benefits. The employees were upset and did not want to work the balance of the week.

The Employer representative, Claudia Cecil, canvassed the employees and all turned down the balance of the work week with the exception of three employees. Later on those three employees also turned down the work. The Employer never canvassed the Union representatives under the assumption that they would turn it down. The Employer blamed this situation on the Grievant for assembling and telling the employees to refuse to work. The Union provided testimony and a statement saying that this was not true. The employees were gathered because they wanted to know what the status was for the balance of the work week. Company representatives were only a few steps behind indicating that the Union representatives did not gather the people. Supervisor McNeese testified that he saw the employees taking a vote by a show of hands. Mr. Randall's testimony was that this never happened. Ms. Thompson testified that the Grievant did not force anyone not to work. The only words that she said that he said were "Just stick together." She stated that the Grievant

never stated to the employees "Don't work." Later she called Ms. Cecil to let her know that she wanted to work and she did work the balance of the week.

The Union representatives had a meeting with the people at the Local Union hall wherein the financial secretary of the Local told them to report to work the next day because they had all volunteered for work and he did not want anyone to get into trouble. All employees did report to work on July 19, 2007, and they were threatened by company representatives that, if they did not leave, they would call the police. The employees did report the following day on July 20 and were sent home. The Employer had called in temporary help. It did not follow the Collective Bargaining Agreement by calling the next senior employees. In addition it violated Article 7 stating that Union representation should have been scheduled and it did not allow one in the plant.

The assistant plant manager testified that everyone that had given testimony before him was lying. He was going to tell the truth. He stated that the Grievant had an angry look on his face and that he was the only one that saw that. This would not be grounds for termination.

The Grievant was charged with numerous violations from July 18 through July 20. All the violations were fabricated and were based on falsehoods. Even if the Grievant had committed all of these violations, the Employer was going to suspend him for a period of 22 days. How did this suspension turn into discharge? The Employer wanted the Union to pick

and choose which representative would stay and who would be discharged. The Union position was that each individual case would be based on its own merits. The Employer decided to terminate both the Grievant and the second shift Union representative. This was not a fair decision.

The Union contended that it is against the law to single out the Grievant for more severe discipline on the basis of his Union position. Under the law the Union argued the only value basis for disciplining a Union steward more harshly than other participants in connection within a legal work stoppage is one (1) where the Collective Bargaining Agreement imposes an affirmative duty on Union officers to end work stoppages and the officers refuse to do so; or (2) where a Union officer was the instigator or active leader of the strike. Neither condition has been met here. The Grievant took immediate action to end what the Employer perceived as an illegal strike. All employees reported to work the following two days, July 19 and 20, and they finished the day on July 18 and left after management released them. The evidence also falls short of establishing that a strike or work stoppage occurred. There were no engines to be torn down and it didn't stop production at the Chrysler plant. In addition the evidence is insufficient to show that the Grievant was an instigator or a leader of what the Employer perceived was a strike or work stoppage.

The Union also contends that this was not a work stoppage but a break violation. There is a difference between an extended break and a work stoppage. After the meeting all employees returned to their work assignments immediately and made no demand of the

12

Employer as a condition of resuming work. The employees had no intent to harm the Employer or gain some concession but only to express their belief to what they believed was a contract for 50 hours of work.

The question to be answered is, Did the punishment fit the crime? Initially, the Grievant was going to receive a 22-day suspension, but that changed because the Union would not agree with the Employer's tactics of picking and choosing one Union representative over another.

The Union tried to offer evidence that would shed enough doubt on the Employer's decision to terminate the Grievant. This was a pre-meditated decision by the human resources manager, Claudia Cecil, to terminate the Grievant because of personality differences. An attempt was made to try to let the Arbitrator get an insight into the Grievant's character to show that he is a decent, dedicated employee and Union representative. He was willing to help anyone in different situations including the human resources manager.

The Union is asking for a just and fair decision from the Arbitrator. The decision that will render the Grievant a justifiable opportunity to resume his career at Android Industries and remain a responsible and productive contributor to the Employer's success as well as his own. The grievance should be sustained and the Grievant made whole.

## DISCUSSION AND OPINION

Since this is a discharge case the Employer does bear the burden of proving that the discharge of the Grievant was in accordance with the contract for just cause not the arbitrary and capricious standard.   Discharge, no matter for what reason, is a very serious situation. It has great impact on the Employer, other employees, and most of all the dischargee. Therefore, it has been in this Arbitrator's practice to require more than just a mere preponderance of evidence for a Employer to prove its case in discharge situations.  This is particularly true when the charge is one of illegal work stoppage and insubordination which not only would result in the consequences that are normally associated with a discharge, but would have a substantial effect on this employee's work record.  However, this Arbitrator has never been persuaded by the argument that the standard of beyond a reasonable doubt would be appropriate in any civil matter.  This is not a criminal case.  The standards of proof that are required by criminal statutes do not apply.  Companies and unions generally do not have the ability to deal with the intricacies of such a difficult proof standard.  Therefore, it has been this Arbitrator's practice to require in cases such as this a clear and convincing level of proof.

The Arbitrator would also note, however, that each side bears the burden of proving its own contentions and, while the Employer bears the overall burden, the Grievant through his representative is required to provide substantive evidence of any contentions that they may make.  Therefore, the Employer must show by clear and convincing proof that the Grievant was guilty of the charges against him.

14

As a background in this matter, the Arbitrator finds that Union animus is not part of this case and, while Android Industries is not totally blameless, it is the Chrysler Corporation that bears the most burden for this incident. It was Chrysler that did not deliver the engines to be worked on in a timely manner through no fault of Android Industries.

The Collective Bargaining Agreement applies always and at all times from the start of the contract in January 19, 2006 through its termination of July 19, 2010. The sign-up sheet for work during the shutdown period is not a contract nor does it supersede the Collective Bargaining Agreement. Therefore, no contract existed regarding the 50 hours.

The Grievant did not have to threaten anyone to violate the Collective Bargaining Agreement. Certainly, the terms of the overtime agreement were not clear and it is natural for the employees to be upset about the situation but, as noted above, their anger should have been addressed to Chrysler and not Android Industries. Certainly, Android Industries would have been very happy if Chrysler had fulfilled its commitment to them so that the employees would have the work that they expected. The Arbitrator understands that the employees were disappointed but a semi-riot certainly did not help the situation.

As chairperson, the Grievant has a special responsibility to uphold the terms of the Collective Bargaining Agreement. The record in this case is clear that the Grievant has an overblown measure of his importance, and he was determined to fulfill his own view of his importance by gaining 50 hours for all employees. Arbitrators have generally found that

15

Union officials do have a special obligation (see Elkouri & Elkouri 6th edition, chap. 5.14 and the Grievance Guide pp. 427-439 and in particular p. 433).

The cardinal principle in labor relations is where an employee or group of employees feels that it has been wronged, that is a situation that should be resolved in the grievance procedure. The concept is work or not work and then grieve. Because of the inflated view of the Grievant's authority, it is clear from the record that he put pressure on employees not to work and those who wanted to work were subjected to additional pressure.

It is unfortunate that the Grievant is inexperienced in his role as a unit chair, but he is in the job and he is responsible for his own actions and special obligations to uphold the Collective Bargaining Agreement. If one were to believe the entire Union case, the Grievant did not do one thing wrong. Likewise, the Employer's case is at least somewhat overblown. If this matter had gone to the grievance procedure, the employees could possibly have been made whole for losses suffered.

The Union put on an exceptionally aggressive case on behalf of the Grievant. The Grievant is a relatively short term employee. The Grievant was given the opportunity to accept a suspension and return to work on a last chance basis. He turned this offer down at his own risk. That the work was unavailable was not the fault of Android Industries but of Chrysler. The Grievant is certainly not a martyr. He can give as good as he gets. He made his own decisions and must accept the consequences. The Grievant was the central figure in

16

this work stoppage and ,in addition, insubordination and, as such, the Arbitrator can find nothing in the record of this case that would allow him to substitute his judgement for that of the Employer, and the grievance shall be denied.

**AWARD**

Grievance denied.

Dated at Chicago, Illinois this 23^nd day of May, 2008.

_____

Raymond E. McAlpin, Arbitrator